DREW, J.
 

 | iWadelen Sumlin was convicted as charged of second degree murder and attempted second degree murder. On the murder conviction, he was sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. He was sentenced to 35 years at hard labor for attempted second degree murder, with the sentences to be served consecutively. He appeals. We affirm in all respects.
 

 FACTSITESTIMONY
 

 On January 9, 2007, 17-year-old Shannon Sanders decided to skip her night school classes to spend time with 23-year-old Quantavious Webb. Sanders had met Webb two weeks before at Shreveport’s Grimmett Drive Apartments, located near her home and reachable by a trail which also led to a bus stop she normally used for transportation to night school from her high school classes.
 

 From 4:00 p.m. until 9:00 p.m., Sanders rode as the passenger in Webb’s vehicle while he illegally delivered drugs to his customers. Webb parked his car in the parking lot of the complex, near the same trail Sanders would have taken to return home.
 

 As the two sat talking, a man in dark clothing came to the passenger side of the
 
 *933
 
 vehicle, walked in front of the car to the driver’s side, and pulled out a gun. The coroner testified that the perpetrator shot Webb ten times before shooting Sanders once in the left arm. This bullet traveled into and out of each breast and into her right arm. The police found sixteen 9mm spent cartridge casings next to the driver’s side door and collected five bullet projectiles from the ground and from inside the vehicle.
 

 |2Webb was pronounced dead at the scene. Sanders, in great pain, was transported to LSU Health Sciences Center (“LSUHSC”).
 

 The police received intelligence from bystanders and from a confidential informant that “Lando” and “Sneaky” were responsible. The officers knew “Lando” to be Renaudo Baker and that Richard Baker was his brother.
 

 The officers included Richard Baker in one photographic lineup and Renaudo Baker in another. That night, shortly after her admission into LSUHSC and prior to receiving any pain medication, Sanders was presented these two lineups from which she was unable to identify anyone. She later stated that she did recognize Renaudo and Richard Baker as being from the neighborhood.
 

 A photograph of “Sneaky” was not included in the first set of lineups because the officers needed to further investigate his/her identity. Sometime later, after determining that Wadelen Sumlin, the defendant, was known as “Sneaky” on the streets, the officers included a photograph of him in a lineup. This was presented to Sanders in the middle of the night, after she had received morphine and Percocet to treat her pain. She was unable to identify anyone in the third lineup.
 

 Sanders consistently gave the following description of the shooter:
 

 Light complected black male wearing dark pants and a dark jacket and a stocking cap on his head with some of his hair sticking out the bottom of the cap, short and stocky build, and scraggly facial hair.
 

 While in the hospital, visitors told her that “Sneaky” and/or the Baker Brothers were responsible. However, not only was the name “Wadelen LSumlin” never mentioned, the physical description (of “Sneaky”) given to her by these visitors did not match her description of the shooter.
 

 While back home, in the presence of her two siblings, she saw on TV a photograph of a robbery suspect from another crime that had occurred a few days after she had been shot. She began to cry that the man on the screen (Sumlin) was the man who shot her and Webb.
 

 Her father contacted Shreveport Police Dept. Detective Lowell Bowen with this information.
 

 An arrest warrant was issued for Sum-lin. Weeks later, he was found in Dallas and transported back to Shreveport. A Caddo Parish Grand Jury indicted him for second degree murder and attempted second degree murder.
 

 At trial, the State’s first witness was Shannon Sanders, who testified that:
 

 • She and Webb smoked marijuana as Webb supplied his customers with drugs;
 

 • At the time of the shooting, she had known Webb only a couple of weeks;
 

 • The shooter walked to the driver’s side, pulled out a gun, and began to shoot Webb, before pausing briefly and shooting her;
 

 • She did not see his face until he was at the driver’s side window; and
 

 
 *934
 
 • She identified Sumlin, in court, as the shooter.
 

 The State’s second witness was Tony Moffett, a Shreveport Fire Department paramedic, who observed the scene of the crime and the condition of Sanders from the moment of his arrival until she was admitted |4to LSUHSC. Moffett testified that the light at the scene of the crime was “fairly dim.”
 

 The State introduced the videotaped deposition of Detective Eric Farquhar, one of the responding officers to the scene. Farquhar was on military duty at the time of trial and therefore unavailable. Defendant was present and with counsel when Farquhar’s deposition was taken. His testimony shed light on the physical condition of the scene of the crime. Based on the information he received, he compiled the two lineups containing the photographs of the two Bakers.
 

 Farquhar testified that Sanders appeared to be in pain and that she looked over the lineups for a “brief two or three seconds” before responding that she did not recognize anyone. Farquhar accompanied Detective Bowen to LSUHSC to show Sanders the third lineup (the one containing the picture of the defendant). During this time, he observed Sanders’ speech to be slurred, her eyes glazed over, and that she no longer appeared to be in pain. When questioned about the lighting at the scene, Detective Farquhar stated that “the area is lit up pretty good” and agreed that “there was enough lighting to be able to observe and recognize the features on a man’s face if seated inside the car.”
 

 The State’s next witness was Cary Byrnes, M.D., who qualified as an expert witness as a medical doctor with special expertise in the field of general surgery. Complications from the gunshot wound required Sanders to undergo a brachial artery bypass (to repair damage to her biceps). Dr. |BByrnes testified that Sanders is likely to suffer scarring and nerve damage for the rest of her life.
 

 The State also introduced a videotaped deposition of Detective Lowell Bowen, who was also on military duty and unavailable for trial. Bowen, one of the first responders, testified that the lighting was sufficient for identification purposes.
 

 Bowen further testified that:
 

 • At the scene he received a call from a confidential informant who provided him with the names of some suspects: Sneaky, Little Richard, and Lando;
 

 • He identified three individuals based on their nicknames (“Sneaky” is Wadelen Sumlin, “Little Richard” is Richard Baker, and “Lando” is Renaudo Baker);
 

 • He put together the photographic lineups based on this information;
 

 • He (and others) presented Sanders with the third photographic lineup;
 

 • After Sanders was discharged and subsequent to her viewing defendant’s photograph on the news, Shannon’s father contacted him;
 

 • Bowen acknowledged that he was responsible for giving the news the photographs of the defendant and Richard Baker for a separate shooting in which the victim survived and was able to pick both suspects out of a lineup;
 

 • The same booking photo was used in the lineup shown to Sanders in the hospital and on the news broadcast; and
 

 • Ms. Sanders told Bowen that it was Sumlin who shot her and Webb.
 

 The State then called Deshelle Smith and Sheldon Sanders, Jr., Sanders’ sister and twin brother, who verified their sister’s recognition of Sumlin on television.
 

 
 *935
 
 Next, the State called Corporal Skylar Vanzant, a Crime Scene Investigator with the Shreveport Police Department, whose duties included | ¡¡protecting evidence and documenting the scene. Vanzant testified that the operational lights in the parking lot/complex effectively illuminated the area where the car was parked (and the shooting occurred). He acknowledged that the bushes on the driver’s side darkened the area somewhat, and that he never found a gun or collected any prints at the scene.
 

 Richard Beighley, a criminalist at the North Louisiana Crime Lab, was qualified as an expert witness in firearms identification. However, since no weapon was ever found, he could only opine as to the type of weapon that could have been used and the possible ammunition count contained therein.
 

 Marcus Alexander testified as to conversations he had with Sumlin following the crime and as to a letter he received from the defendant. He testified that Sumlin confessed to the crime just days after it occurred and asked him to “take care of’ Sanders or to direct another person to do so. He had knowledge of facts unknown to the public, including knowledge of the police escort provided to Sanders.
 

 At the time he testified, Alexander was awaiting sentencing for a felony charge in federal court. The record shows that the State offered him nothing for his testimony other than making his cooperation known to the federal authorities.
 

 Caddo Coroner Todd Thoma, M.D., testified as to the autopsy report, noting that Webb died from gunshots: one in the neck, five in his chest, and four in his arm.
 

 17James Patterson, M.D., was qualified as a medical doctor with special expertise in the field of psychiatry. He gave his opinion as to why Sanders was unable to identify the defendant in the lineup she was shown at the hospital, but was later able to identify him from a picture seen on the news. He offered the following explanation: the timing of the third lineup (the only one containing a picture of the defendant) was at the worst possible time for this patient as she was tired from being up all day and from this ordeal; the requested identification occurred at a time she would ordinarily be asleep; she was in a state of shock and mental distress; she had just been shot and witnessed her friend being killed; and she was cognitively impaired because of the painkillers. Conversely, when she saw the news broadcast, she was well rested, not in a state of mental shock, and no longer under the influence of opiates.
 

 The defendant attacked the identification by Sanders, arguing that the lack of lighting in the parking lot prevented her from observing the person who shot her and Webb, and arguing that her marijuana use affected her memory.
 

 Requanta Young, Marcus Alexander’s fiancée, testified in conformity with him. The State’s last witnesses were two Shreveport Police Dept. Officers: Lt. Brian Strange and Inv. Don Ashley. Their testimony was given as 404(B) evidence, for the purpose of showing motive. Specifically, they each related their experience with gang activity in Shreveport and its connection to the defendant and the deceased. Through their experience, they identified Sumlin as a member of the Grimmett Drive |sGang (noting his tattoo — “GDG”) and Webb as a member of their rivals, the Cooper Road Gang. They gave a timeline of the events leading to this shooting, showing a tit-for-tat scenario of retaliation that was the motivation for
 
 *936
 
 the shooting.
 
 [1]
 

 DISCUSSION
 

 Defendant assigns three errors: (1) sufficiency, (2) improper other crimes evidence, and (3) the consecutive nature of the two sentences.
 

 Sufficiency
 

 In this assignment, the defendant argues that:
 

 • the evidence presented by the State was full of contradictions and open questions, mainly a questionable delayed identification by the victim, testimony from a felon looking for relief and purported experts who had nothing concrete to say, except that the defendant may have had a motive to commit this crime because he was a member of a gang;
 

 • Shannon’s identification is not credible because it was delayed and she was influenced by friends who told her that the defendant was responsible;
 

 • Alexander is not a credible witness and his testimony is self-serving; and
 

 • the officers who testified as experts on gangs did not have any information about this particular crime and therefore were not credible witnesses.
 

 The State asserts that the jury was fully aware of all of these flaws, yet justly found the evidence to be sufficient to support the verdicts in these two cruel and unnecessary crimes.
 

 |i,The provisions of La. R.S. 14:30.1(A)(1) state in pertinent part:
 

 Second degree murder is the killing of a human being:
 

 (1) When the offender has a specific intent to Mil or to inflict great bodily harm.
 

 The provisions of La. R.S. 14:27(A) state in pertinent part:
 

 Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
 

 Our law on appellate review of sufficiency is well settled.
 
 [2]
 

 
 *937
 
 A review of the evidence presented at this trial, viewed under the standard established in
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is sufficient to support all of the elements of both convictions for the following nonexclusive reasons:
 

 • Sanders, the only eyewitness, identified Sumlin as the shooter;
 

 • There is testimony by an expert in the field of psychiatry rationally explaining the delayed identification;
 

 • The defendant confessed to his friend, Alexander, and asked him to “take care of her”;
 

 • The jury was well aware of Alexander’s pending federal criminal problems, in-eluding his upcoming sentencing, as well as the fact that the State was not offering and was unable to reduce his sentence; and
 

 • There is physical evidence that Sumlin had the specific intent to kill both Webb (who died from the gunshot wounds) and Sanders (who was shot and survived).
 

 It was up to the trier of fact to make a credibility determination and weigh the evidence. These two consolidated records contains ample evidence by which to support a conviction.
 

 Improper La. C.E. art. 404(B) Evidence
 

 Our law on the review of other crimes evidence is well settled.
 
 [3]
 

 
 *938
 
 Defendant argues that the trial court erred in allowing improper La. C.E. art. 404(B) evidence, which was intended to and did show Sumlin to be a bad person.
 

 The State asserts that the evidence of appellant’s gang affiliation was introduced to prove motive,
 
 ie.,
 
 to explain why he would have walked up to a car and started shooting its occupants for no apparent reason. The State argues that but for the testimony of Lt. Strange and Investigator Ashley, the trier of fact would not have known the meaning of “gang script” contained in Sumlin’s letter to Alexander, nor the history of gangs in Shreveport, nor 112the rivalry between the two North Shreveport gangs, all of which establishes Sumlin’s motive for shooting the victims. Had this evidence not been allowed, the jury would have had to decide this case in a vacuum.
 

 Both SPD Lt. Brian Strange and Inv. Don Ashley testified on violent crime in general, with special emphasis on violent crime as it relates to gang activity in the City of Shreveport.
 

 The following 404(B) evidence was at issue pretrial and at trial:
 

 (1) The testimony of Lt. Strange and Inv. Ashley regarding the history of gang activity in Shreveport and specifically the history of conflict between the rival gangs with which Quantavious Webb and the defendant were affiliated;
 

 (2) The testimony of Marcus Alexander, a friend of the defendant, about a conversation he had with him just days after the shooting;
 

 (3) The mail Sumlin sent to Alexander while incarcerated;
 

 (4) The photographs of Sumlin’s tattoos (“GDG” and “Mr. Sneaky”);
 

 (5) Sumlin’s phone call to Alexander while incarcerated;
 

 (6) Sumlin’s membership in the Grim-mett Drive gang;
 

 (7) Webb’s affiliation with the Cooper Road gang; and
 

 (8) The 18 months of gang warfare between the two groups.
 

 
 *939
 
 The specific evidence, offered to prove motive, intent, preparation and plan for the homicide, is summarized as follows:
 

 • That on December 22, 2006, Quantavious Webb was involved in a verbal altercation at a local gang hot spot, the nightclub Caliente’s, with Calvin Edwards, a member of the Grimmett Drive Gang;
 

 11⅞* That on January 3, 2007, Calvin Edwards, a member of the Grimmett Drive Gang, was killed by Kimberly Daniels, who is from Peach Street;
 

 • That Kimberly Daniels was never prosecuted for the murder of Calvin Edwards because of her convincing claim of self-defense;
 

 • That this series of events gave rise to a “tit for tat” scenario where members of the rival gangs would retaliate against the other for any perceived slight;
 

 • That Sumlin was a member of the Grim-mett Drive Gang, and Quantavious Webb was affiliated with the Cooper Road or Peach Street Apartment Gang;
 

 • That 1-220 was the boundary for these gangs, with the Cooper Road Gang being north of 1-220 and the Grim-mett Drive Gang controlling south of 1-220; and
 

 • That the deceased Quantavious Webb, a member of the Cooper Road or Peach Street Apartment Gang, was physically present at the Grimmett Drive Apartments on the night he was fatally shot.
 

 In
 
 State v. Barnes,
 
 28,835 (La.App.2d Cir.12/11/96), 685 So.2d 1148, we stated that members of gangs are not regarded as model citizens and there is an inherent connotation that a gang member is involved in criminal activity. Evidence of defendant’s gang membership may be prejudicial but this does not necessarily mean that the evidence is improper.
 

 Our court has recently reviewed the issue of gang affiliation evidence.
 
 [4]
 

 h/The evidence clearly proves that defendant and the deceased were members of rival gangs, that there was mounting tension between the two groups, and that, in the gang world, this type of retaliation is wholly within the bounds of their everyday life. The defendant’s gang affiliation has independent relevance in establishing the defendant’s motive and intent for second degree murder and attempted second degree murder. Gang membership is not dispositive of the issue of guilt, but in combination with the other factual testimony, it is certainly probative.
 

 The trial court properly found this other crimes evidence admissible under La. C.E. art. 404(B). The State proved with clear and convincing evidence the defendant’s gang affiliation and other criminal activities surrounding the instant offenses. The State also proved that the evidence came under one of the exceptions set forth in La. C.E. art. 404(B). The fact of gang affiliation was relevant to show defendant’s motive in killing Webb and trying to kill Sanders. The State showed that the evidence was more probative than prejudicial.
 

 
 *940
 
 The defendant is a self-proclaimed “Grimmett Drive Gangsta” who was identified by Sanders as the man who shot her and the deceased. The defendant confessed to Alexander and asked him to take care of Sanders. At the absolute worst, this evidence was harmless error. The total of 11 gunshot wounds provide ample evidence to justify the convictions.
 

 Consecutive Sentences
 

 The defendant argues that the imposition of consecutive rather than concurrent sentences violates his constitutional rights. He posits that the [ ^sentences are constitutionally excessive, and not justified by the record, in that the trial court did not provide adequate reasons for running the sentences consecutively.
 

 The State counters that consecutive sentences are warranted here, because:
 

 • there was an appreciable pause between the shooting of the two victims;
 

 • the record provides an adequate factual basis to support consecutive sentences;
 

 • this was the shooting of an unarmed and unsuspecting couple; and
 

 • Sanders, the main witness, was stalked and intimidated prior to the trial.
 

 Our law on appellate review of sentences is well settled.
 
 [5]
 

 11(iIn the instant case, the court provided two justifications for the consecutive sentences it imposed: (1) Sanders’ status as an innocent bystander; and (2) the number of shots fired into the victim who died.
 

 Although the defendant is correct in his assertion that the court did not extensively provide its reasons for judgment, this does not automatically require that the consecutive sentences be amended so as to be served concurrently.
 

 The record establishes that Webb was repeatedly shot at close range, unarmed and unsuspecting. In a separate act, some moments later, the defendant shot Sanders, ostensibly a complete stranger, at close range. She survived, but with last
 
 *941
 
 ing physical and emotional wounds. This crime was motivated by nothing more than gang affiliation and retaliation. This record supports the imposition of consecutive sentences for these heinous and unnecessary crimes.
 

 ERROR PATENT
 

 Confusingly, the minutes as to the verdicts of the jury, in both records, are flawed. The trial court is directed to order the Caddo Parish Clerk of Court to amend the minutes to conform with the transcript.
 

 DECREE
 

 The defendant’s convictions and sentences are AFFIRMED.
 

 [1]
 

 . Investigator Ashley testified that on December 22, 2006, at a Shreveport nightclub, Webb had his picture taken with his money fanned out. Calvin Edwards, a member of the Grim-mett Drive Gang, threw his money down in front of Webb as a sign of disrespect. On January 9, 2009, Edwards was fatally stabbed by Kimberly Daniels who is associated with the Cooper Road Gang. Daniels claimed self-defense and was never prosecuted.
 

 [2]
 

 . The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);
 
 State
 
 v.
 
 Tate,
 
 2001-1658 (La.5/20/03), 851 So.2d 921,
 
 cert. denied,
 
 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004);
 
 State v. Cummings,
 
 95-1377 (La.2/28/96), 668 So.2d 1132;
 
 State v. Murray,
 
 36,137 (La.App.2d Cir.8/29/02), 827 So.2d 488,
 
 writ denied,
 
 2002-2634 (La.9/5/03), 852 So.2d 1020. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.
 
 State v. Pigford,
 
 2005-0477 (La.2/22/06), 922 So.2d 517;
 
 State v. Robertson,
 
 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Gilliam,
 
 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508,
 
 writ denied,
 
 2002-3090 (La.11/14/03), 858 So.2d 422.
 

 
 *937
 
 The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law.
 
 State v. Casey,
 
 99-0023 (La.1/26/00), 775 So.2d 1022,
 
 cert. denied,
 
 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
 

 In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of state witnesses, obviously believed by the trier of fact, is sufficient support for a requisite factual conclusion.
 
 State v. Wiltcher,
 
 41,981 (La.App.2d Cir.5/9/07), 956 So.2d 769;
 
 State v. Burd,
 
 40,480 (La.App.2d Cir. 1/27/06), 921 So.2d 219,
 
 writ denied,
 
 2006-1083 (La.11/9/06), 941 So.2d 35.
 

 [3]
 

 . Generally speaking, evidence pertaining to the defendant's commission of crimes, wrongs or acts, other than the one with which he is currently charged, is inadmissible, when the only purpose of such evidence is to prove the defendant’s character and thus his subsequent disposition to break the law. La. C.E. art. 404;
 
 State v. Harrison,
 
 604 So.2d 583 (La.1992).
 

 The underlying rationale is that the prejudicial tendency of such evidence, in that the finder of fact is likely to convict because the defendant is a “bad person” regardless of the strength of evidence against him in the case being tried, outweighs the probative value of the evidence.
 
 State v. Gay,
 
 616 So.2d 1290 (La.App. 2d Cir.1993).
 

 Some exceptions to this general rule are listed in La. C.E. art. 404, which provides in part that:
 

 [ejvidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
 

 There are other jurisprudential factors to consider to determine whether evidence of other acts may be admitted.
 

 First, one of the exceptions listed in Article 404(B) must have some independent relevance, or be an element of the crime charged; in addition, such factor must be a genuinely contested issue at trial.
 
 State v. Welch,
 
 615 So.2d 300 (La.1993);
 
 State v. Jackson,
 
 625 So.2d 146 (La.1993).
 

 Second, the state must make a showing of fact which would support a jury finding that the defendant committed the prior act by a preponderance of the evidence. La. C.E. art.
 
 *938
 
 1104;
 
 State v. Langley,
 
 95-2029 (La.App. 4th Cir.9/4/96), 680 So.2d 717,
 
 writ denied,
 
 96-2357 (La.2/7/97), 688 So.2d 498;
 
 State v. Crawford,
 
 95-1352 (La.App. 3d Cir.4/3/96), 672 So.2d 197,
 
 writ denied,
 
 96-1126 (La.10/4/96), 679 So.2d 1379.
 

 Third, even if independently relevant, the evidence may be excluded if its probative value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. La. C.E. art. 403.
 

 Lastly, the requirements set out in
 
 State v. Prieur,
 
 277 So.2d 126 (La.1973) must be met.
 

 Under
 
 Prieur,
 
 in order to comply with due process the state is required to:
 

 (1) give pretrial notice of its intent to use evidence of other crimes; and
 

 (2) prior to admission of the evidence, show that the evidence is not repetitive or cumulative, serves the purpose for which it is offered, and is not pretext for portrayal of the defendant as a person of bad character.
 

 Additionally,
 
 Prieur
 
 requires that, upon request of the defendant, the jury be charged that the evidence was received for the limited purpose of proving an issue for which other crimes evidence may be admitted, such as intent, and that the defendant cannot be convicted of any charge other than the one named in the indictment or one that is responsive to that charge.
 

 The erroneous admission of other crimes evidence is subject to harmless error analysis.
 
 State v. Maise,
 
 2000-1158 (La.1/15/02), 805 So.2d 1141. The test for determining harmless error is whether the reviewing court may conclude the error was harmless beyond a reasonable doubt, "i.e., was the guilty verdict actually rendered unaltributable to the error.”
 
 State v. Casey,
 
 99-0023, p. 13 (La.1/26/00), 775 So.2d 1022, 1033. A trial court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion.
 
 State v. Butler,
 
 30,798 (La.App.2d Cir.6/24/98), 714 So.2d 877,
 
 writ denied,
 
 98-2217 (La.1/8/99), 734 So.2d 1222.
 

 [4]
 

 . "The fact of gang affiliation was relevant to show his motive to specifically injure the intended victim, who was affiliated with a rival gang. The record further supports the trial court's finding that the evidence relates to conduct that constitutes an integral part of the [crimes]. Finally, a review of the record supports the conclusion that the state showed that the evidence was more probative than prejudicial.”
 
 State v. Brown,
 
 42,054, pp. 12-13 (La.App.2d Cir.8/29/07), 965 So.2d 580, 588,
 
 writ denied,
 
 2007-1939 (La.2/15/08), 976 So.2d 174.
 

 [5]
 

 . La. C. Cr. P. art. 883 states in pertinent part:
 

 If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively.
 

 There is no requirement that such offenses receive concurrent sentences. Rather, as the statute makes clear, this decision is within the trial court’s discretion.
 
 State v. Coleman,
 
 32,906 (La.App.2d Cir.4/5/00), 756 So.2d 1218,
 
 writ denied,
 
 2000-1572 (La.3/23/01), 787 So.2d 1010.
 

 When the court imposes consecutive sentences for offenses arising out of the same act, it shall consider certain factors and state that it has so considered and provide its reasons for the consecutive sentence.
 
 State v. Green,
 
 614 So.2d 758 (La.App. 2d Cir.1993).
 

 The factors to be considered include tire defendant’s criminal history,
 
 State v. Jacobs,
 
 493 So.2d 766 (La.App. 2d Cir.1986); the gravity or dangerousness of the offense,
 
 State v. Adams,
 
 493 So.2d 835 (La.App. 2d Cir.1986),
 
 writ denied,
 
 496 So.2d 355 (La.1986); the viciousness of the crimes,
 
 State v. Clark,
 
 499 So.2d 332 (La.App. 4th Cir.1986); the harm done to the victims,
 
 State v. Lewis,
 
 430 So.2d 1286 (La.App. 1st Cir.1983),
 
 writ denied,
 
 435 So.2d 433 (La.1983); whether the defendant constitutes an unusual risk of danger to the public,
 
 State v. Jett,
 
 419 So.2d 844 (La.1982); and the potential for defendant's rehabilitation,
 
 State v. Lighten,
 
 516 So.2d 1266 (La.App. 2d Cir.1987).
 

 Although the imposition of consecutive sentences for such offenses requires a justification from the evidence or record, a failure on the part of the court to articulate its specific reasons does not require remand as long as the record provides an adequate factual basis to support consecutive sentences.
 
 State v. Hampton,
 
 38,017 (La.App.2d Cir.1/28/04), 865 So.2d 284,
 
 writ denied,
 
 2004-0834 (La.3/11/05), 896 So.2d 57,
 
 writ denied,
 
 2004-2380 (La.6/3/05), 903 So.2d 452. This record clearly does.