EDWIN A. LOMBARD, Judge.
hThe defendant, Nathaniel Sippio, appeals his conviction for armed robbery, a violation of La.Rev.Stat. 14:64, raising two assignments of error: (1) the evidence is insufficient to support the conviction; and (2) he was denied a fair trial due to the State’s improper comments during its rebuttal argument. The State also appeals, arguing that the trial court erred in refusing to impose a greater sentence based on the use of a firearm in the armed robbery. After review of the record in light of the applicable law and arguments of the parties, we affirm the defendant’s conviction and sentence.

Relevant Facts and Procedural History

On July 25, 2011, Dwayne Russ was robbed in his apartment at 1716 South Saratoga Street in New Orleans, Louisiana. Mr. Russ, who was confined to a wheel chair at the time of the robbery, immediately called 911 and reported the robbery.
On November 2, 2011, by bill of information, the defendant was charged with one count of armed robbery using a firearm, a violation of La.Rev.Stat. 14:64.3. He was arraigned, pleaded not guilty, and at the subsequent conclusion of his two-day trial on July 24, 2012, was found guilty of the lesser offense of armed | ¡.robbery by a twelve-person jury. On August 15, 2012, the trial judge sentenced him to serve twelve years at hard labor without benefit of parole, probation, or suspension of sentence.

Defendant’s Assignment of Error 1

In challenging the sufficiency of the evidence, the defendant does not dispute that an armed robbery occurred; he argues only that the State failed to show beyond a reasonable doubt that he was one of the perpetrators.

Applicable Law

In reviewing a sufficiency of the evidence claim, we must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 *296 So.2d 676, 678 (La.1984); see also La.Code Crim. Proc. art. 821 (“A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty”).
Pursuant to La.Rev.Stat. 14:64, an “[ajrmed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another by use of force or intimidation, while armed with a dangerous weapon.” When, as in this case, the key issue is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification. State v. Dorsey, 2010-0216, p. 43 (La.9/7/2011), 74 So.3d 603, 633 (citation omitted). Notably, a positive identification by a single witness is sufficient to support a conviction and, accordingly, the testimony of a victim or witness alone is usually sufficient to | ..¡support the verdict, as appellate courts will not second-guess the credibility determinations of the fact finder beyond the constitutional standard of sufficiency. Id., 74 So.3d at 633. Therefore, “[i]n the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the fact-finder, is sufficient support for a requisite factual conclusion.” Id., pp. 43-44, 74 So.3d at 634 (citation omitted).

Relevant Facts

The following evidence was adduced at the defendant’s trial.
Detective Jonathan Bulliung of the New Orleans Police Department (NOPD) testi-fled that he arrived at Mr. Russ’s apartment shortly after the robbery. He met with Mr. Russ (who was confined to a wheelchair), Charles Berry (Mr. Russ’s brother and neighbor), as well as the officers who initially responded to the 911 call reporting the robbery. He saw a rifle and sweatshirt on the couch in Mr. Russ’s living room that Mr. Berry stated was abandoned by the gunman in the robbery.
Mr. Russ related to Detective Billiung that three men had broken into his apartment; one of them brandished a gun, the second man demanded his property, and the third simply watched. According to Mr. Russ, the first man held a gun to his head while the second rifled through his pockets. The three men left the apartment with Mr. Russ’s cell phone, approximately $80.00, some Xanax pills, and a pack of cigarettes. Mr. Russ did not specifically identify the robbers by name but stated that he had previously seen them in his neighborhood. Mr. Russ described the robber who searched him and did all the talking (subsequently identified as the defendant in this case) as a slim African-American male, twenty to twenty-three years old, with dreadlocks. He described the gunman as a fat | ¿African-American male in the same age range with short hair. Based on these descriptions and other unspecified information, Detective Bulli-ung concluded that the defendant (Sippio) was the likely perpetrator who physically searched Mr. Russ while Davonte Thirsty[1] was the likely gunman. Accordingly, he subsequently compiled a photographic lineup including the defendant’s photograph and showed it separately to Mr. Russ and Mr. Berry separately at the Sixth District police station. Mr. Russ did not identify anyone in the lineup (although according *297 to Detective Billiung his “eyes widened” when he saw the defendant’s photograph), but Mr. Berry identified the defendant as one of the men he saw running from his brother’s house after the robbery.
Based on Mr. Berry’s identification, an arrest warrant was issued for the defendant. Two days later, he was arrested during an unrelated traffic stop and taken to the Sixth District police station where he was questioned by Detective Billiung. After being advised of his Miranda rights, the defendant first denied any knowledge of the robbery, insisting that he was with his girlfriend on the Westbank at the time it occurred. His girlfriend failed to confirm this alibi, denying to Detective Bulli-ung that she was with the defendant at the time of the robbery. Subsequently, the defendant admitted under further questioning by Detective Bulliung that he was in the area of the robbery during the pertinent time period but insisted he was not one of the perpetrators and had only heard of the incident when some men tried to sell him Xanax pills taken in the robbery. Detective Bulliung stated that no one had informed the defendant that Xa-nax pills had been stolen during the robbery.
|sThe defendant was then transported to Central Lockup and made a statement to the transporting officer that, when relayed to Detective Billiung, resulted in a compilation of a second photographic lineup’ that included Mr. Thirsty. Mr. Russ did not identify Mr. Thirsty but Mr. Berry identified him as “Fat Boy,” a man he knew from the neighborhood and the man he saw carrying a gun from Mr. Russ’s apartment immediately after the robbery.
On cross-examination, Detective Bulli-ung related that Mr. Berry lived nearby and spotted the three men fleeing his brother’s apartment from the distance of approximately three houses. He conceded that the defendant never admitted to participating in the robbery and that defendant’s home address was not in the area of the robbery. He also conceded that the defendant was not in possession of any of the stolen property when he was arrested and there was no indication that he had used the stolen cell phone. On redirect, Detective Bulliung confirmed that the defendant’s girlfriend told him she had last seen the defendant on the afternoon of the robbery about 4 p.m. at the corner of Terpsichore and Prytania Streets, approximately a mile from the victim’s apartment, and that the robbery occurred at approximately 5:30 p.m.
Erin Williams, a NOPD complaint officer and custodian of recordings made of 911 calls, identified the recording of Mr. Russ’s 911 call. In the call, which was played for the jury, Mr. Russ stated that ■ he was afraid and that the perpetrators could still be in the area.
Officer Jeffery Yount, one of the arresting officers, also testified. According to Officer Yount, he and his partner conducted a traffic stop on a vehicle in which the defendant was a rear-seat passenger. After the occupants of the car filled out field interview cards, Officer Yount recognized the defendant’s name as one he Rhad heard during roll call. Accordingly, Officer Yount frisked the defendant and placed him in the back of the police unit while he confirmed the arrest warrant. After issuing traffic citations to the driver of the stopped vehicle, Officer Yount returned to the defendant and advised him of his Miranda rights. The defendant indicated he understood his rights and was taken to the Sixth District police for questioning by Detective Bulliung. Officer Yount testified that he was present for most of the questioning, during which the defendant initially denied any involvement in the robbery and then admitted that he *298 was in the area but was not involved in the robbery. However, when he later asked the defendant who was involved in the robbery, the defendant provided the name “Davonte.”
On cross-examination, Officer Yount conceded that no Xanax pills were recovered from the vehicle. Although Officer Yount could not recall how much money the defendant had when arrested or if he had a pack of cigarettes, he confirmed that his report described the defendant as 5'5" and 135 pounds with a given address of 2606 Gravier Street. Officer Yount further confirmed that the defendant mentioned the name “Davonte” only after Detective Bulliung left the room. Finally, Officer Yount agreed that the defendant never admitted that he was one of the robbers or that he had ever entered the victim’s apartment.
Mr. Berry also testified. He stated that his brother was paralyzed at the time of the robbery and had died five months before trial. According to Mr. Berry, in July 2011 he lived at 1630 S. Saratoga, about three houses and a street apart from his brother’s apartment. He admitted he had three prior convictions for burglary, as well as ones for theft and possession of stolen goods, but pointed out that he had not been incarcerated since 1997.
|7On the day of the robbery, Mr. Berry exited his house and looked toward his brother’s apartment. He saw three men leaving his brother’s front door rapidly, removing shirts that had covered their heads as they exited the apartment; one of the men had a gun. Mr. Berry yelled at the men and they fled, two of the men ran down the right side of his brother’s apartment and the man with the gun ran down the left side of the house. Accordingly, Mr. Berry ran to his brother’s apartment to check on him. Mr. Russ told Mr. Berry that he had been robbed, that the robbers put a gun to his head, and that the robbers had taken his pills, money, and cell phone. After telling his brother to call the police, Mr. Berry went outside to check around the building where he had seen the gunman running. He first found the sweatshirt discarded by the gunman on a neighbor’s trash can at the front of the gate to the backyard. Mr. Berry then checked the backyard where he found the rifle lying in the neighbor’s yard on the other side of the fence. Mr. Berry took the sweatshirt and rifle into his brother’s apartment.
Mr. Berry testified that he recognized the gunman, who was the first robber out the door, as well as the second robber out the door as men he had seen in the neighborhood. He knew the gunman as “Fat Boy” or Davonte, a man who lived at South Saratoga and Terpsichore. Mr. Berry then positively identified the defendant in the courtroom as the second robber he saw leaving the apartment. Mr. Berry stated that, although he had seen the defendant in the neighborhood, he did not think the defendant lived in the area. He did not know the third robber. He estimated that he was twenty feet from the robbers as they fled the house.
Mr. Berry reiterated on cross-examination that the only one he saw with a gun was “Thirsty.” He said that when he described the gunman to the police, he identified him by the name “Fat Boy.” Mr. Berry denied drinking on the day of |strial and, although he had been arrested for public drunkenness, denied any convictions for that offense. Mr. Berry stated that he did not give the officers a physical description of the robbers, but admitted that he told them that the robber with the dreadlocks (who he identified as the defendant) drove a gray car that was parked on the corner and that he gave the officers the car’s license plate number. On redirect, *299 Mr. Berry explained that the description that he gave of the second robber, subsequently identified as the defendant, was that he was slim and had dreadlocks. He insisted that he had no doubt that the second robber was the defendant because the robbery occurred during daylight hours and nothing obstructed his view of the robbers leaving his brother’s apartment.
Finally, James Huey testified that part of his job with the Orleans Parish Sheriffs Office was to retrieve the recordings of all calls made by inmates at the prison. He testified that each time an inmate makes a phone call, he must give his folder number, and that folder number is only valid in the area where that inmate is being held. Accordingly, he identified the call detail report assigned to the defendant’s folder number for calls made by the defendant on July 28, 2011, reflecting that on the day he was booked into Central Lockup, the defendant made three calls. The recordings of these calls were played for the jury.[2]

Discussion

A review of the evidence present at trial clearly establishes that three men, one with a firearm, entered the victim’s home and robbed him of Xanax pills, | ¡¡money, a cell phone, and a pack of cigarette. Most importantly, a witness (Mr. Berry) positively identified the defendant in a photographic lineup soon after the robbery and again at trial as one of the three men who exited his brother’s apartment immediately after the robbery.
The defendant argues that this eyewitness identification is not reliable because Mr. Berry only briefly saw the robbers as they fled the scene of the crime. In addition, he takes exception to Mr. Berry’s estimate that he was only twenty feet from the robbers, arguing that this is incorrect because Mr. Berry testified that he first saw the robbers exit his brother’s apartment as he was leaving his own house which is, in fact, a few houses, a vacant lot, and a street away from his brother’s apartment. Finally, he asserts that Mr. Berry testified that it took him three to five minutes to run from his house to his brother’s apartment. This last assertion is a misstatement of the facts, however, as Mr. Berry’s testimony was that he did not know how long it took him to get to his brother’s apartment, but it “wasn’t maybe about five to three minutes or something like that, you know, from across the street.” [emphasis added]. Moreover, although Mr. Berry’s estimate as to the exact distance may be erroneous, he was clearly close enough to the robbers to immediately recognize the defendant and the gunman as men he had seen in the neighborhood and, importantly, the jury clearly found Mr. Berry’s testimony and identification of the defendant credible.
The defendant also points to the fact that the victim did not give the police his name as one of the robbers or identify him in the photographic lineup. However, the testimony of one witness is sufficient to support a conviction. Moreover, in light of Mr. Russ’s statement in the 911 call that he was afraid and that the perpetrators could still be in the area, it is noteworthy that Detective |inBulIiung observed Mr. Russ’s eyes widening when he saw the *300 defendant’s photograph in the lineup, suggesting perhaps the Mr. Russ recognized the defendant but was afraid to identify him.
Finally, the defendant points out there is no physical evidence to tie him to the robbery and that he never admitted being involved in the robbery; that the descriptions given by the victim and Mr. Berry were consistent but “somewhat vague;” and the car Mr. Berry reported to the officers as belonging to the robbers was never linked to him.
As previously noted, the identification by one witness (in this case, Mr. Berry) is sufficient to support the conviction. The lack of physical evidence does not exonerate the defendant or render Mr. Berry’s identification of him invalid. Moreover, although Mr. Berry saw the robbers for only a short time, he recognized the defendant as someone he had previously seen in the neighborhood. In addition, given that the first robber to run out the door of his brother’s apartment was carrying a gun and wearing a shirt around his head, one can reasonably conclude that Mr. Berry’s degree of attention was acute. As Mr. Berry stated, it was daylight and there was nothing to obstruct his view of the three robbers running out of his brother’s apartment removing shirts wrapped around their heads. In addition, Mr. Berry identified the defendant in a photographic lineup shortly after the robbery. Thus, under these circumstances, evidence is sufficient to support the jury’s finding that the State negated any possibility of misidentification and thereby proved beyond a reasonable doubt that the defendant was one of the men who armed robbed Mr. Russ and, therefore, viewed in the light most favorable to the prosecution, the evidence clearly supports the defendant’s conviction. This assignment of error is meritless.
| n Defendant’s Assignment of Error 2
In his second assignment of error, the defendant argues that he was deprived of a fair trial by the prosecutor’s improper comments during closing arguments. Specifically, the defendant points to the prosecutor’s references in rebuttal argument on race, defense counsel’s attempt to manipulate evidence, and evidence to which Detective Bulliung did not testify.

Applicable Law

Article 774 of the Louisiana Code of Criminal Procedure provides that the scope of closing argument “shall be confined to the evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.” Article 774 further provides that closing argument “shall not appeal to prejudice,” and the State’s rebuttal argument “shall be confined to answering the argument of the defendant.” La.Code Crim. Proc. art. 774. In addition, a prosecutor should refrain from making personal attacks on defense strategy and counsel. State v. Manning, 2008-1982 (La.10/19/04), 885 So.2d 1044 (citations omitted). Mistrial is a drastic remedy, however, and the determination of whether prejudice to the defendant has resulted from the prosecutor’s comments lies in the sound discretion of the trial judge. State v. Draughn, 2005-1825, p. 44 (La.1/17/07), 950 So.2d 583, 614; see also State v. Prestridge, 399 So.2d 564, 580 (La.1981) (a trial judge has broad discretion in controlling the scope of closing argument). On appellate review, even once it has been determined that a prosecutor’s argument has exceeded the scope of Article 774 or is deemed improper, in determining whether such error was prejudicial, the previewing court must credit the jurors who heard the evidence with good sense and fair-mindedness. State v. *301 Williams, 96-1023 (La.1/21/98), 708 So.2d 703.

Relevant Facts

The prosecutor’s rebuttal argument is necessarily viewed in the context of defense counsel’s closing argument. In this case, defense counsel set forth in detail what he considered to be shoddy police work in his closing argument. He pointed to the victim’s inability to identify the defendant as one of the robbers and to the fact that, in his statements to the police, the defendant never admitted to being one of the robbers. Defense counsel also attempted to cast doubt on Mr. Berry’s ability to recognize the defendant, speculating that, based on his prior arrests for public drunkenness, Mr. Berry was probably under the influence of alcohol when he saw the robbers leave his brother’s apartment. Next, in speaking about the composition of the lineup containing the defendant’s photograph, defense counsel pointed out that the description given by the police included the robber’s height, weight, skin color, and hair color. Defense counsel then asked the defendant to stand next to him and stated:
I can see that he is a young black male, rather on the slim side. But to me he looks pretty average, all right. Thousands of young black males are in New Orleans that look like this kid. Thousands of them.
Defense counsel then noted that the detective used these physical characteristics, including skin color, to compile the photo lineup, stating:
Just to plug an individual’s physical characteristics into a computer system’s database and it pops up with a bunch of black males, it doesn’t work like that. Or, at least, it’s not supposed to. And that’s reasonable doubt. It’s reasonable doubt if you just base this solely off an individual’s physical characteristics. Think about that. Think about that.
h3In rebuttal to defense counsel’s argument, the prosecutor recounted Mr. Berry’s testimony as to what he saw, his recovery of the weapon, and his identification of the defendant in the photographic lineup. The following then occurred:
MS. REED [THE PROSECUTOR]:
Now, pay attention to this because it’s another way that Defense counsel is trying to manipulate testimony.
He would have you believe that all that the information — the only information that the officer was presented with was a height description, a weight description. I guess he doesn’t want you to forget a black person. And that’s about it for Mr. Sippio. The officer said time and time again, I even wrote it down, “and other information.” Other information. He wasn’t permitted to talk about that information, but other information. Mr. Shlosman [defense counsel] knows that.
MR. SHLOSMAN [DEFENSE COUNSEL]:
Objection, Judge.
MS. REED:
And, so, armed—
THE COURT:
Overruled.
MS. REED:
Armed with other information, in addition to physical characteristics, he didn’t put Mr. Sippio’s name in some system to come up with young black boys who were in the neighborhood. This was not some rogue attempt on behalf of the New Orleans Police Department, nor is it an attempt on behalf of the District Attorney’s Office because it would be us acting, I assume, to put an innocent black man, because Mr. Sip-pio — I’m sorry, Mr. Shlosman doesn’t *302 want you to forget that this is about a black man. That’s not what this is about.
MR. SHLOSMAN:
Judge, I never said anything about a black man.
J^MS. REED:
You talked about him being a black man all day.
THE COURT:
Overruled. Again, the Jury will rely on its memory. And, again, the statements made by the attorneys are not evidence.
MS. REED:
That’s prejudice, an attempt to put that in here, put a little racial element in it for you. That’s not what this case is about. A crime was committed, a person saw him, he identified somebody, police officers get information, they show a photographic lineup, he says that’s the person who I saw leaving out of my brother’s residence. That’s what this is about. Don’t get lost in all of the other things that he’s asking you to invite into this.

Discussion

The defendant first argues that he was deprived of a fair trial because the prosecutor referred to “other evidence” not introduced at trial. He speculates that the prosecutor’s reference was to information gleaned at the pretrial suppression hearing where Detective Bulliung testified that Mr. Berry recognized the defendant because the defendant had been arrested a few weeks prior to the robbery for possession of a firearm. However, this speculation is gratuitous because Detective Bulliung mentioned “other evidence” at least three times during trial: once during direct examination, once during cross-examination, and again during redirect. Notably, defense counsel not only failed to object to the detective’s brief references to the “other evidence” in the detective’s direct and redirect examination but, in fact, elicited testimony from the detective on cross-examination that he had used other information besides the description given by Mr. Berry and Mr. Russ to compile the photographic lineup with the defendant’s photograph. Specifically, defense counsel asked Detective Bil-liung: “And, based on that description, you | iBwere able to locate a picture of Mr. Sippio, correct?” To which Detective Bul-liung responded: “Not based off that information alone. There were other things.”
In his brief before this court, the defendant speculates that the prosecutor’s reference to “other evidence” in rebuttal argument may have led the jury to believe that defense counsel kept the jury from finding out other information that would have prejudiced the defendant, possibly that he had prior convictions or that there were other witnesses whose testimony could have harmed him. This is pure supposition on appellate counsel’s part. Clearly, in light of Detective Bulliung testimony that that he had other evidence when he compiled the lineup and defense counsel’s closing argument that the lineup was the product of only the description given by the victim and his brother, the prosecutor’s comment in rebuttal argument about “other evidence” was a comment on a fact elicited at trial and was in response to defense counsel’s argument.
Next, the defendant points to the prosecutor’s statement concerning defense counsel “manipulating the evidence.” However, defense counsel failed to object to this statement during trial and, therefore, any error related to this comment is not preserved for appeal. See La.Code Crim. Proc. art. 841 (a defendant must make a contemporaneous objection in order to preserve an alleged error for review); see also *303 State v. Taylor, 91-2496, p. 5 (La.App. 4 Cir. 3/29/94), 635 So.2d 416, 420 (contemporaneous objection rule exists so error may be corrected at the time it is made and also “serves notice in the record that the complained of conduct was so noticeable as to create prejudice in the minds of the jurors”).
Finally, the remaining comment in the prosecutor’s rebuttal argument to which the defendant objects pertains to the prosecutor’s allegation that defense counsel brought race into his closing argument. As indicated in the quoted |; fiportions of the transcript, defense counsel had the defendant stand next to him during the part of his closing argument concerning the photographic lineup and pointed out that the defendant was a black man whose description would fit thousands of other black men in the area. Thus, the prosecutor was not incorrect in her assertion that defense counsel had raised the issue of race in his argument; defense counsel’s argument was clearly aimed at showing that the description would have matched many black males in the area. This assignment of error has no merit.

State’s Assignment of Error

By its sole assignment of error, the State asserts that the trial court erred by denying its motion to sentence the defendant in accordance with La.Rev.Stat. 14:64.3, armed robbery committed with a firearm, which mandates an additional five years at hard labor for an armed robbery that involved a firearm. The State acknowledges that the defendant was originally charged with a violation of La.Rev. Stat. 14:64.3 and that the jury returned the lesser verdict of armed robbery which does not require the imposition of an additional five years to the defendant’s sentence. Nonetheless, the State argues that the trial court should have taken into consideration that the evidence showed that the defendant’s co-defendant (Mr. Thirsty) was armed when the men robbed the victim. Thus, the State argues that the defendant’s twelve-year sentence is illegally lenient because he was subject to a minimum ten years imprisonment for the armed robbery, plus an additional five years because a firearm was used in the commission of the robbery.

Applicable Law

After briefs were filed in the appeal, the United States Supreme Court rendered its decision in Alleyne v. United States, — U.S.-, 133 S.Ct. 2151, 186 L.Ed.2d 314 |17(2013), which held that factors which increase the mandatory minimum sentence must be submitted to the jury. Specifically, Alleyne held that because mandatory minimum sentences increase the penalty for a crime, it necessarily follows that “any fact that increases the mandatory minimum is an element’ that must be submitted to the jury.” - U.S. at -, 133 S.Ct. at 2155.

Discussion

In this case, the defendant was indicted for armed robbery with a firearm under the enhanced penalty provision of La.Rev. Stat. 14:64.3. The jury, however, convicted him only of armed robbery, a violation of La. 14:64, which does not include the enhanced penalty provision for use of a firearm during the armed robbery. Thus, as in Alleyne, the jury did not find that the State proved beyond a reasonable doubt the element that would increase the mandatory minimum the defendant would receive. Therefore, the trial court did not err in denying the State’s motion to increase his sentence based on the use of a firearm in the robbery. The State’s assignment of error has no merit.

Conclusion

After review of the assignments of error put forth by the parties in light of the *304 applicable law, as well as our own independent review for errors patent, we affirm the defendant’s conviction and sentence.
AFFIRMED.

. Mr. Thirsty was charged and, after pleading guilty to armed robbery, was sentenced to serve ten years at hard labor without benefit of parole, probation, or suspension of sentence.

. The record before this court does not contain the CD of the recording, but references to the calls in closing arguments indicate that in the first call, the defendant told the recipient of the call that he had been arrested for an armed robbery charge, but it had been "the little dudes around the way" that had done it, and he was not going to "rat” them out. In a later call, however, the defendant spoke with a different person and described where to find the pills that he had hidden in the car in which he had been riding when he was arrested and at another location near a house.