MADELEINE M. LANDRIEU, Judge.
| rDemond Sandifer appeals his conviction and sentences for second degree murder committed in furtherance of gang activity. For the reasons that follow, we affirm his conviction, vacate his sentences due to a patent error, and remand to the trial court for re-sentencing.

STATEMENT OF CASE

On May 8, 2013, Mr. Sandifer was charged by indictment with the second degree murder of Milton Davis committed in furtherance of gang activity.[1] He pled *121 not guilty. The trial court heard and denied his motions to suppress the evidence, statement and identifications. On August 20, 2014, at the conclusion of a three-day trial, a twelve-person jury found Mr. San-difer guilty as charged. The trial court denied Mr. Sandifer’s motion for new trial and sentenced him to life imprisonment at hard labor without benefit of parole, probation, or suspension on |2the murder charge, plus a consecutive “half a life” sentence on the gang enhancement charge. Mr. Sandifer appeals his conviction and sentences.

FACTS

Mr. Sandifer is accused of shooting and killing Mr. Milton Davis on August 14, 2011, near the corner of Martin Luther King Boulevard and South Robertson Street. An autopsy revealed that Mr. Davis had sustained four gunshot wounds, two of which were fatal:
Mr. Davis was dead when Det. Robert Long arrived at the murder scene in response. to a 911 call. Det. Long discovered Mr. Davis’s body lying near one side of a double house in the block. The area contained spent casings in three different calibers. Three other men, namely Ray Allen, Jajuan Forshey, and Shawn Grayson, had also been shot and had been transported to a hospital by the time Det. Long arrived. He and other officers canvassed the area, spoke with the surviving victims and their families, including Mr. Davis’s brother, and viewed nearby surveillance camera footage, but they developed no suspects. They were not given any descriptions of the shooters by witnesses or the surviving victims. Det. Long testified that several people told him they feared retaliation if they gave any information.[2]
In 2013, Det. Richard Chambers of the Cold Case Division received a call from the district attorney’s office informing him that a witness, Passion Cobbins, had volunteered information about Mr. Davis’ murder while being interviewed Uabout an unrelated homicide. Det; Chambers met with Ms. Cobbins and Det. Ryan Bart on Febru'ary 26, 2013. Based upon what Ms. Cobbins told him, Det. Chambers developed Demond Sandifer, whose nickname was “Lil D,” as a suspect in the murder. Det. Chambers compiled a photographic lineup, which he gave to Det. Travis Ward, who had no other connection with the case, to show to Ms. Cobbins. Det. Ward testified that Ms. Cobbins positively identified Mr. Sandifer as the man she had seen shooting at Mr. Davis. He then showed Ms. Cobbins a lineup containing the photograph of Mr. Sandifer’s half-brother, Sain Newman, whom she positively identified as having been- present at the shooting. Det. Ward testified that he conducted a double blind photographic procedure, meaning that he himself did not know what case the lineup was related to or which photo in the lineup depicted the suspect.
Det. Chambers also interviewed Ms. Cobbins’ cousin, Cash Cobbins, who had been grazed by a bullet during the shooting. Cash Cobbins was incarcerated in St. Tammany Parish Prison at the time of the interview. Afterward, Det. Chambers had Det. Decynda Barnes, who had no other connection to the case, show a photo lineup *122 to Mr, Cobbins. Mr. Cobbins identified the photo of Mr. Sandifer as the person he had seen shoot Mr. Davis. Det. Chambers testified that this identification was not the product of any promises, suggestion, force, coercion, or threats, and that Mr. Cobbins had made the identification without any expectation of benefit with respect to the sentence he was serving.
|4The State presented the testimony of Passion Cobbins, Cash Cobbins and Mr. Ray Allen, one of the men shot in the array of gunfire that killed Mr. Davis. The State also presented the testimony of Mr. Sandifer’s father, law enforcement witnesses, and evidence gathered from phone calls and social media to establish that Mr. Sandifer had shot and killed Milton Davis, as charged in the indictment.
Passion Cobbins testified that, she- grew up in the “Melph,” the Melpomene Project.[3] She stated that on the day of the murder, she was on the street nearby, talking with a female cousin and. her friend, Laura, when she. saw a black car make the block. When it made the block a second time, it stopped, and she saw “Lil D” get out, dressed all in black and carrying a black gun, and skip toward the murder scene. She stated that “Lil D” started shooting before he reached Martin Luther King Boulevard, and the men in the area scattered. She identified “Lil D” as Mr. Sandifer, whom she had known for a long timé. She was certain it was “Lil D” because she looked him right in the eyes and watched him shoot Milton" Davis. She had known Mr. Sandifer for years because she had a prior relationship with his brother, Sam Newman; Ms. Cobbins testified that when the shooting stopped, Mr. San-difer went back to the black ear and got into the passenger seat. Ms, Cobbins also testified that she saw Sam Newman sitting in-the car. Although she had earlier told the police that Sam, too, had been shooting, she testified that after she thought about it, she could not really remember Sam shooting. She insisted, however, that she had seen Mr, Sandifer shoot Mr. Davis. Ms. Cobbins said she remained on the scene until the police arrived but did not speak with the police ^because Mr. Sandifer was still on the streets. She also stated that other people, inctoding her cousin Cash Cobbins, were on the scene that night.
Ms. Cobbins identified the “YMM” as the Young Melph Mafia, a gang that had conflicts with another gang know as the the llOers. The. llOers originated in the Tenth and Eleventh wards of New Orleans. She stated that two of the shooting victims, Mr, Allen and Mr. Grayson, as well as Cash Cobbins, were members of the YMM, but that Mr. Davis was not.
Ms. Cobbins stated that she was 100% sure of her identifications of Mr. Sandifer and of Sam Newman from the lineups she had viewed. She noted she had written on the back of Mr. Sandifer’s photo that “Lil D was the first "person to get out the car and shooting [sic] on MLK that day.” She also admitted that on Sam Newman’s pho-. tograph, she had written: “Sam 'was the second guy to get out in [sic] shoot on Martin Luther King that day.” At trial she explained that she really had'been watching only Mr. Sandifer, and because she had not paid any attention to anyone else, she did not know who the other shooters were that day. She insisted that she had not been promised anything in exchange for her testimony.
Ray Alien, one of the surviving victims of the shooting, testified that at the time of the shooting, he lived in the nearby Melpo *123 mene Project.[4] Mr. Allen and Mr.. Davis were sitting on the stoop of . a double residence, with Mr. Forshey standing nearby. Mr. Allen testified that when he heard shots, he jumped up, turned, and ran. He insisted that he did not see where the shots came from, and he did not see who was firing. He admitted that if he had looked, he- probably would' be dead due to “the man right there,” apparently referring to Mr. Sandifer. Mr.lsAllen, who was shot three times that night, ran to the corner, where he fell. All of the gunshots came from behind him as he ran. He was shot in the back, leg and arm. Once; the paramedics arrived, they transported Mr. Allen to a hospital. Mr. Allen said that he knew Cash Cobbins, .who. was also present that night. Cash Cobbins testified that he grew up in the Melpomene Project with Mr. Davis.[5] Mr. Cobbins was visiting with his sister in the project on the evening of the murder, He was walking through the area with his young niece when they came upon Mr. Davis, Mr. Forshey, and Mr. Allen, who were sitting on the steps of a residence. He then saw three people, all dressed in black, running toward Martin Luther King Boulevard with guns.. One of the men was “Lil D.” Mr. Cobbins grabbed his niece and ran toward his sister’s house, then stopped, turned around, and saw Mr. Davis lying on the ground. Mr. Cobbins said he heard at least three different guns shooting. He was certain that Mr. Sandi-fer was the person who had shot at Mr. Davis. Mr. Cobbins left the scene after the murder because he-was upset, as the shooting reminded him of the shootings of many of his family members. He did not speak with the police. He did not realize until later that he had been grazed by a bullet.
Mr. Cobbins testified that in May, 2013, while he was incarcerated in St. Tammany Parish Prison, a female detective and a male detective came to see him. By that time, he had already received his five-year sentence. When the detectives asked him who had shot Mr. Davis, he responded that “Lil D” from the Tenth ward did it. Mr. Cobbins was shown a lineup that day and he identified Mr. Sandifer. Mr. Cobbins said he was 100% sure that Mr. Sandifer shot the victim, and insisted [7that the identification had not been the product of any promises. Mr. Cobbins insisted that Mr. Davis was not involved in the YMM, but named others at the -.scene of the shooting who were members of the gang.
Former NOPD Detective Christopher Harris, with the FBI at the time of trial, testified that he had helped execute a search warrant at a residence, 2117 Gen. Taylor Street, -in June 2012. Sam Newman and several other people were present, including a man who identified himself as Larry Sandifer. The ■ detective later learned that this man was actually the defendant, Demond-Sandifer. -Pursuant to the warrant, the officers recovered cellphones. Det. Harris turned the phones over to Det. Hamilton.
Det. Gregory Hamilton collected the evidence from the Gen. Taylor Street residence. ■ He obtained a warrant to search the cellphones seized in the residence and downloaded their contents to a CD, including calls from the date of the murder. On another CD he downloaded photos takén from the phones’ SIM cards.
*124 The original investigating officer, Det. Chambers, testified that during the course of the investigation, he was contacted by Det. Steven Keller of the NOPD Intelligence Division. Det. Keller had obtained a recording of a phone call on the night of the murder between Mr. Sandifer and his then incarcerated half-brother, Rico Newman, in which the brothers had talked about the murder.[6] James Huey, who worked in the Communications Department of the Orleans Parish Sheriffs Office, testified that his primary responsibility was inmate telephone calls. Mr. Huey identified a call made by Rico Newman at 10:00 p.m. on August 14, 2011, |sthe night of the murder. The State played a recording of that call and presented the jury with a transcript of the call.
Mr. Sandifer’s father, Antonio Johnson testified that he grew up in the Eleventh Ward.[7] He stated that he has ten children, including Sam Newman, Rico Newman, and Mr. Sandifer, his son by a different mother. Mr. Johnson identified Rico’s and Mr. Sandifer’s voices on the recording of the jailhouse call played for the jury. Mr. Johnson admitted he was testifying pursuant to a plea agreement, but he insisted that he was being truthful.
Det. Keller, formerly with the NOPD but with the Jefferson Parish Sheriffs Office at the time of trial, testified that while with NOPD, he had investigated gang activity in New Orleans. He had become familiar with “Lil D,” whom he identified as Mr. Sandifer, in early 2011. He also had become familiar with the llOers through social media. He explained that the llOers were composed of three affiliated gangs: the Saint Thomas Youngins (“STY”), the St. Mary’s Mafia (“SMM”), and the Skull Squad Mafia (“SSM”). He testified that he had downloaded photos off the internet, which the State then introduced as evidence. The photos were timestamped, and some showed the “street names” of the people depicted in the photos. He stated that the names on the photos were used often in jailhouse calls.
Det. Keller identified for the jury a chart of pages downloaded from Facebook to identify members of the llOers. He stated that the tag “TM” referred to “Trouble Makers” or “Team Murder.” He noted that Mr. Sandifer used the |9“TM” tag in several of his posts. Det. Keller also identified two homemade rap videos from You Tube that show Mr. Sandifer with members of the llOers and members of SSM. Two of the participants in one video are shown making hand gestures, including a “B” that the detective said referred to a deceased SSM member. Det. Keller also identified various photographs taken from one of the cellphones that had been seized from the Gen. Taylor residence; these photos show Mr. Sandifer making the same hand gestures shown in the videos. Other photos depict the house where Mr. Davis was murdered and Mr. Sandifer holding a black semi-automatic weapon.
The parties stipulated, in contradiction to the testimony of Passion Cobbins, that *125 Sam Newman was in the Jefferson Parish Prison on August 14, 2011, the day of the shooting.

DISCUSSION

Errors Patent

A review of the record for patent errors reveals one. The trial court failed to wait the mandatory twenty-four hours between the denial of Mr. Sandifer’s motion for new trial and the imposition of sentence, as mandated by La. C.Cr.P. art. 873.[8] This Court has held that the trial court’s failure to observe the required twenty-four hour delay is harmless error where the defendant does not complain of his sentence on appeal. State v. Berniard, 2014-0341, pp. 9-10 (La.App. 4 Cir. 3/4/15, 9-10); 163 So.3d 71, 79-80, writ denied, 2015-0678 (La.2/26/16), 187 So.3d 468 (Mem.); State v. Duncan, 11-0563, p. 8 (La.App. 4 Cir. 5/2/12), 91 So.3d 504, 511. In addition, the trial court’s failure to observe the delay is harmless error where the sentence imposed was mandatory. Duncan, supra. Here, the trial court ImSentenced Mr. Sandifer to life imprisonment without parole, probation, or suspension of sentence, as mandated by La. R.S. 14:30.1, enhanced by a consecutive half-a-life term pursuant to La. R.S. 15:1403 B. Whereas the life term is mandatory, the term of the enhancement is discretionary within a range of one year to one half the term provided for the underlying offense. La. R.S. 15:1403 B.
Mr. Sandifer assigns as error the exces-siveness of his life sentence and the illegality of his gang enhancement sentence. In addition, while La.C.Cr. P. art. 873 provides that a defendant may expressly waive the twenty-four-hour delay, Mr. Sandifer did not do so. We therefore vacate Mr. Sandifer’s sentences and remand for re-sentencing.[9]

Sufficiency of the Evidence

Mr. Sandifer first contends that the State failed to elicit sufficient evidence to prove that he was the person who shot Mr. Davis. He asserts that the testimony of the State’s witnesses who identified him was not credible, and that there was no physical evidence to tie him to the murder.
When reviewing a claim of insufficiency of evidence, the appropriate standard was set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979): the court must determine whether the evidence, viewed in the light most favorable to the prosecution, “was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Captville, 448 So.2d 676, 678 (La.1984). If the State uses circumstantial |1Tevidence to prove the elements of the offense, “La. R.S. 15:438 requires that ‘assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” State v. Neal, 2000-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657. A reviewing court must give deference to the credibility determinations of the fact finder, and the court must not re-weigh the evidence. State v. Jones, 2010-0018, p. 6 (La.App. 4 Cir. 11/10/10), 51 So.3d 827, 831.
*126 Mr. Sandifer was convicted of second degree murder, which is defined by La. R.S. 14:30.1 as the killing, of a human being where “the offender has the specific intent to kill or to inflict great bodily harm.” In addition, the conviction .was enhanced as per La. 15:1403 B, which provides:
Any person who is convicted of a felony or an attempted felony which is committed for the benefit of, at the direction of, or in association with any criminal street gang, with the intent to promote, further, or assist in the affairs of a criminal gang, shall, upon conviction for that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be imprisoned for not less than one year nor more than one-half of the maximum term of imprisonment provided for that offense.
Mr. Sandifer does not dispute that a perpetrator committed the second degree murder of Mr. Davis or that the murder was in furtherance of gang activity. Instead, he argues that the evidence does not prove beyond a reasonable doubt that he was the perpetrator. We find this argument to be without merit.
This court set forth the standard for determining if the State adequately proved identity in State v. Stewart, 2004-2219, p. 6 (La.App. 4 Cir. 6/29/05), 909 So.2d 636, 639:
|iaWhen identity is disputed, the State must negate any reasonable probability of misidentification in order to satisfy its burden under Jackson v. Virginia [443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)]. The reviewing court must examine the reliability of an identification according to the test set out in Manson v. Brathwaite, /432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)] (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness’ degree of attention; (3) the accuracy of the witness’ prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation.
Id. (emphasis added) (citations omitted). A positive identification by only one witness is sufficient to support a conviction. State v. Neal, supra, p. 11 (La.6/29/01), 796 So.2d 649, 658. Even in the absence of any physical evidence to tie a defendant to a case, the testimony of one witness, if believed by the jury, is sufficient to support a conviction. State v. Dussett, 2013-0116, p. 11 (La.App. 4 Cir. 10/2/13), 126 So.3d 593, 601.
Here, both Passion Cobbins and Cash Cobbins positively identified Mr. Sandifer as one of the people who shot at Mr. Davis. Passion Cobbins testified that she saw a black car circle the block, stopping the second time, and she saw Mr. Sandifer get out of the car, dressed all in black and carrying a gun, and run over to Martin Luther King Boulevard, shooting as he approached the victims. She testified that she was acquainted with Mr. Sandifer because she had had a relationship with his brother, Sam Newman. Cash Cobbins, who was near Mr. Davis and who sustained a graze wound in the shooting, also positively identified Mr. Sandifer, whom he knew as “Lil D.” He stated that he ran when he first heard the gunshots but then turned around and saw “Lil D” shooting at Mr. Davis.
| taMr. Sandifer first argues that these identifications lack credibility because they were made eighteen months after the shooting, neither witness having identified him at the time of the shooting. We note, however, that Passion Cobbins testified that she did not talk to the police at the *127 time of the shooting because she feared that the shooter, who was still on the street, would retaliate. Her identification was not made until the defendant and several other gang members had been put behind bars. As for Cash Cobbins, he explained that he had not remained in the area after the shooting waiting for the police to arrive because .he was upset, the shooting having remincled him of other family members who had been shot.
Mr. Sandifer next argues that Passion Cobbins’ mistaken testimony regarding Sam Newman casts doubt on the reliability of her identification. As previously noted, Ms. Cobbins first informed the police that she also had seen Sam Newman exit the car and begin shooting, but at trial acknowledged that, after thinking about it, she remembered only that she had seen Sam sitting in the car; she did not see him shoot. The parties stipulated that Sam was incarcerated in Jefferson Parish on the day of the murder. The jury heard Ms. Cobbins’ testimony and was aware of this contradiction. However, the jury chose to believe Ms. Cobbins’ testimony. A fact finder’s credibility determination is entitled to great weight and should not be disturbed unless it is contrary to the evidence. State v. Johnson, 2009-0259, p. 9 (La.App. 4 Cir. 9/16/09), 22 So.3d 205, 211.
1 uMr. Sandifer next argues that neither eyewitness had a good opportunity to view the shooter. The basis for this argument is his assertion that other, unnamed witnesses at the scene, had told the police that the shooters’ heads and faces were covered with bandanas. However, the record contains no testimony or evidence to this effect.[10]
Mr. Sandifer next argues that the eyewitness identifications of him were 'not credible •’because Mr. Allen, one of the shooting victims, was unable to identify any of the perpetrators. Mr. Sandifer also points out that the State failed to interview or present at trial Ms. Cobbins’ cousin or her friend, both of whom were standing with Ms. Cobbins 'when the shooting began. Mr. Allen’s testimony that he did not see the shooter does not contradict the "eyewitnesses’ testimony; nor is there any indication that either Ms. Cobbins’ cousin or her friend would have contradicted her identification of the defendant as the shooter.
Mr. Sandifer next argues that there was no physical • evidence linking him to the murder. However, as we have noted, the witnesses’ identifications are sufficient to support his conviction. See State v. Dussett, supra.
Finally, Mr. Sandifer argues that both Passion and Cash Cobbins made identifications solely out of a hope for leniency and the possibility that they would not be facing multiple bills. There is no basis in the record for this assertion.[11] |1fiCash Cob-bins testified that by the time he spoke with the police, lie .had. already been convicted in St. Tammany Parish and sentenced to serve five years at hard labor, a sentence that he was serving at the time of trial. As for Passion Cobbins, she first spoke about this shooting while being interviewed in connection with an unrelated murder investigation. Nothing in the record indicates that Ms. Cobbins was impli *128 cated in this or the other murder. When Ms. Cobbins testified at trial, the prosecutor noted that she was under arrest for an aggravated assault with a firearm but had not been promised anything in return for her testimony.
Both Passion and Cash Cobbins positively identified Mr. Sandifer as one of the men who shot at the victim. The jury apparently believed their testimony, and there is nothing to show that this belief was contrary to the evidence. We therefore find no merit to this assignment of error. The record demonstrates that the evidence was sufficient for the jury to find beyond a reasonable doubt that Mr. Sandi-fer committed the second degree murder of Milton Davis in furtherance of gang activity.

Excessiveness of sentences

By his final assignment of error, the appellant contends that the trial court imposed excessive sentences. We pretermit discussion of this assignment of error in light of our remand for re-sentencing due to the patent error discussed above.

J^CONCLUSION

For the reasons stated, we affirm Mr. Sandifer’s conviction, vacate his sentences and remand for re-sentencing, reserving to Mr. Sandifer the right to appeal his sentences once they are imposed.
CONVICTION AFFIRMED; SENTENCES VACATED; REMANDED

. The fifty-one-count indictment also charged Mr. Sandifer with one count of racketeering and unrelated counts of conspiracy to discharge firearms while in the perpetration of a *121 violent crime, armed robbery with a firearm, two counts of second degree murder, two counts of being an accessory to second degree murder, and possession with the intent to distribute cocaine; all charges are alleged to have been committed in furtherance of gang activity. Prior to trial, the State severed the count charging second degree murder of Milton Davis from the other counts, which are not subjects of this appeal.

. Det. Long stated that, after a certain period of time, the murder was classified as a "cold case.”

. Ms, Cobbins admitted that she had a pending charge against her.

. Mr. Allen testified that at the time of trial, he was incarcerated for armed robbery and was serving a twelve-year sentence. He also admitted to having prior convictions for second degree battery and burglary.

. At the time of trial, Cash Cobbins was serving a five-year sentence for possession of heroin and had prior convictions for attempted distribution of cocaine.

. The record reflects that Mr. Sandifer has two half-brothers, Rico Newman and the aforementioned Sam Newman. See discussion of testimony of Antonio Johnson, infra.

. Mr. Johnson admitted having prior convictions for possession with the intent to distribute cocaine, conspiracy to engage in racketeering, and accessory after the fact to murder. He stated that he had received an eight-year sentence for the latter conviction, with the promise not to be charged as a third offender, in exchange for his testimony as to gang activity by the llOers. He admitted that his attorney had filed a'motion to reconsider his sentence, but he insisted he had received no promises as to the disposition of the motion.

. This failure was also assigned as an error by Mr. Sandifer in his appellant brief.

. Mr. Sandifer also argues that this case is not properly before this court because the record does not reflect that he ever moved for an appeal in this case. While the record from the trial court does not contain a motion for or notice of appeal, this court’s records indicate that we received a notice on January 14, 2015, showing that an appeal had been granted on December 18, 2014. Thus, Mr. Sandi-fer’s conviction is properly before this court for appellate review.

. The record shows that there was a discussion outside the jury's presence concerning the police report, which supposedly indicated thát some unnamed people at the scene had said the shooters' faces were covered.

. The record reflects that Antonio Johnson, Mr. Sandifer's father, testified pursuant to such an agreement, but his testimony was limited to identifying his sons’ voices on the jailhouse call and providing general information about activity by the llOers gang.