Judge Daniel L. Dysart
11 Defendant-appellant, Glynn . Hawkins, appeals his convictions of second degree murder, discharge of a firearm during a violent crime and obstruction of justice, while defendant-appellant, Alex Lewis, appeals his conviction of second degree murder. In this appeal, Mr. Hawkins and Mr. Lewis both raise* the issue of whether the trial court erroneously allowed evidence of their gang affiliation to be introduced at trial. In addition, Mr. Hawkins argues that the trial court erroneously allowed evidence of other crimes to be introduced at trial. Mr. Lewis raises the separate issue of whether there was sufficient evidence adduced at trial to support his conviction.
Finding no merit to these assignments of error and for the reasons set forth more fully herein, we affirm the defendants’ convictions and sentences.
FACTS AND PROCEDURAL HISTORY
On the afternoon of March 9, 2013, Bertrand Dezara was murdered in the courtyard of an apartment building in eastern New Orleans. Shortly before or around the time of the murder, the New Orleans Police Department was dispatched to the scene after a 911 call had been made and "an aggravated burglary had been reported.
L.Two days later, on March 11, 2013, a shootout occurred on Claiborne Avenue near Washington Avenue in New Orleans between the occupants of two moving vehicles. A handgun used during the shootout and recovered from the scene was determined to have been one of the guns used in the murder of Mr. Dezara. ■
On May 28, 2013, Mr. Hawkins and Mr. .Lewis were jointly indicted by an Orleans Parish grand jury for the second degree murder of Mr. Dezara.[1] Mr. Hawkins was also indicted on two other counts; namely, for the discharge of a firearm during a violent crime and for obstruction of justice. Both’ of the latter charges arose from the March 11, 2013 shootout on Claiborne Avenue.
Defendants pled not guilty to the charges and filed motions to suppress the evidence and identifications, which were denied by the trial court. The State then filed a motion to allow Prieur[2] evidence as *1136 to Mr. Hawkins and a motion to allow introduction of evidence of gang association as to both of the defendants. The State’s motions were granted and Mr. Lewis sought a supervisory writ of review as to the trial court’s ruling on the admissibility of gang association evidence. This Court denied the writ application on August 18, 2014.[3]
LA jury trial was held in September, 2015 and defendants were found guilty on all counts. After motions for a new trial were denied, defendants waived delays and proceeded to sentencing. The trial court sentenced Mr. Lewis to life imprisonment at hard labor, without the benefit of probation, parole or suspension of sentence. Mr. Hawkins received the same sentence on the second degree murder count. As to the conviction of the discharge of a firearm during a violent crime, Mr. Hawkins was sentenced to twenty years at hard labor, without the benefit of probation, parole or suspension of sentence. Mr. Hawkins received the same twenty year sentence for his conviction of obstruction of justice. All of Mr. Hawkins’ sentences were to run concurrently.
The State then filed a multiple bill of information as to Mr. Hawkins based upon his convictions for discharge of a firearm and obstruction of justice. A hearing on the multiple bill was held on November 16, 2015, at which time the trial court adjudicated Mr. Hawkins to be a third felony offender. His prior sentences were vacated and the trial court re-sentenced him to eighty years at hard labor without the benefit of probation, parole or suspension of sentence on the discharge of a firearm charge; and forty years at hard labor on the charge of obstruction of justice, also to be served without the benefit of probation, parole or suspension of sentence. The trial court ordered these sentences to be served concurrently with each other and the sentence on the second degree murder conviction.
Mr, Hawkins filed a motion for new trial which was denied by the trial court. This appeal followed.
LTRIAL TESTIMONY

April 19, 2012 murder of Jeffrey Do-mingue

Detective Justin Rice, who in April, 2012, was a detective with the homicide division of the New Orleans Police Department (“NOPD”), testified that, on April 19, 2012, he was the lead investigator of a homicide which occurred on Jackson Avenue at Carondelet Street. When he arrived at the scene, he found the victim, Jeffrey Domingue, slumped over in a vehicle which had crashed into a bus. The victim had been shot several times and was already deceased. Detective Rice obtained the license plate number of the suspect’s vehicle, and also learned from eyewitnesses that there were at least four occupants of that vehicle at the time of the shooting.
Detective Rice then determined that the suspect’s vehicle had been rented from Avis Budget Rental by Norman Johnson. Detective Rice contacted Mr. Johnson who advised that he had rented the vehicle for Quilla Harris, his girlfriend’s daughter. *1137 Detective Rice questioned Ms. Harris, who advised that she had allowed her cousin, Eric Harris, and his friend, “Glynn” to use the vehicle.
Detective Rice determined that “Glynn” was likely Glynn Hawkins (because the Intelligence Division of the NOPD was aware that Eric Harris and Mr. Hawkins were associates of one another) and discovered that, on the date of the shooting, Mr. Hawkins was wearing a GPS ankle monitor. Detective Rice then obtained the records of Mr. Hawkins’ GPS ankle monitor and learned that, at the time of Mr. Do-mingue’s murder, Mr. Hawkins was located at the intersection of Jackson Avenue and Carondelet Street. The records reflected that, around that time, Mr. Hawkins was moving at a fast pace, suggestive of his having been in a vehicle travelling at a high rate of speed on Carondelet Street.
|fiMr. Hawkins was arrested in connection with Mr. Domingue’s murder and pled guilty to accessory after the fact (See footnote 2, supra ).[4] Mr. Hawkins was released from prison on January 30, 2013.

March 9, 2013 murder of Bernard De-zara

On March 9, 2013, Sergeant Arlen Barnes, who at the time was a member of the NOPD Task Force assigned to assist with patrols of the Seventh District, responded, around 2:54 p.m., to a 2:51 p.m. 911 phone call reporting an aggravated burglary at an apartment complex in eastern New Orleans. When he arrived, he encountered the decedent, Mr. Dezara, who showed no signs of life, lying adjacent to Building Q of the apartment complex.[5] Mr. Dezara’s body exhibited several gunshot wounds. Sergeant Barries notified the NOPD homicide division, and Detective Maggie McCourt, of the NOPD homicide division, arrived and took over the investigation.
• According to Detective McCourt, while the investigating officers attempted to locate witnesses shortly after Mr. Dezara’s death, they were unable to do so. She then learned of the earlier 911 call which had reported the aggravated burglary and she directed two officers (Detective Jacob Lundy, a detective with the homicide division, and Detective Vaught) to the apartment from which the call was made (located in Building Q).[6] There, the officers found two individuals—Mr. Bryer and Lance Stewart. According to Detective Lundy, Mr. Bryer and Mr. Stewart both indicated that they did not know the identity of the man who had been |fishot in the courtyard. At that time, he considered Mr. Bryer and Mr. Stewart to be victims of the aggravated burglary.
According to Detective Lundy, at the apartment, Mr. Stewart relayed that he had been sitting on the sofa talking on the telephone when Mr. Bryer entered the room with his hands up and a black male behind him with a gun. Both he and Mr. Bryer denied knowing of any connection between the aggravated burglary and Mr. Dezara’s murder. However, several minutes after the perpetrators left the scene, he heard gunshots.
• Mr. Stewart advised that, after the aggravated burglary, he attempted to call the police “but his phone was acting crazy.” *1138 He then, called his “sister,” Corielle Brown, to report what had happened.[7]
After being interviewed at the apartment, Mr. Bryer arid Mr. Stewart were transported to the police station for interviews and were placed in separate interview rooms. Detective McCourt personally viewed the interviews and she testified that Mr. Bryer .and Mr. Stewart gave consistent descriptions of the perpetrators. She also testified that she observed Mr. Bryer putting his ear to a wall, in an apparent attempt to hear what was taking place in the adjacent interview room.
During the interviews, the officers were able to obtain telephone numbers of calls made, from Mr. Stewart’s phone. They later obtained a subpoena for those phone records in order to determine what calls were made before and after Mr. Dezara’s murder. According to Detective McCourt, all but one call made from Mr. 17Stewart’s phone were to a pre-paid cellular phone for which there were no records or subscriber information.
Detective McCourt notified Mr. Dezara’s next-of-kin, his mother, Sonja Miller, of the death of her son. Ms. Miller indicated that she wanted to retrieve her son’s belongings from Corielle Brown’s apartment (the very apartment from which the 911 call had been made and where Ms. B’rown, Mr. Bryer and Mr. Stewart were found after Mr. Dezara’s murder) and bn March 11, 2013, Detective McCourt contacted Ms. Brown about Mr. Dezara’s personal belongings. At that time, Detective McCourt learned' from another officer with the homicide division that an individual whose nickname was, “G-4” was a possible suspect in Mr. Dezara’s murder. ■ She then learned from Detective Rice (the lead investigator of the Domingue murder) that “G-4” was Mr. Hawkins.[8]
The following day, March 12, 2013, Ms. Brown and Mr. Stewart met with Detective McCourt at the office of the homicide division. A photographic lineup was shown to Mr. Stewart and he positively identified Mr. Hawkins as one of the men who had entered his apartment on the day of Mr. Dezara’s murder.[9] She then obtained an arrest warrant for Mr. Hawkins.
A- couple of days later, Ms. Brown contacted Detective McCourt and provided her with photograph depicting three individuals; one was Mr. Bryer and the other was Mr. Hawkins. Detective McCourt did not' recognize the third person; however, Detective Rice identified him as Mr. Lew- ■ is. Another photographic | «lineup was conducted with Mr. Stewart who positively identified the third person as the other person who had entered the apartment on the day of Mr. Dezara’s murder—Mr. Lewis. Detective McCourt obtained an arrest warrant for Mr. Lewis.
Corielle Brown also testified at trial. She indicated that she lived in Apartment. Q23 with. Mr. Stewart and her daughter. While Mr. Bryer did not live with her, he would visit occasionally.- The victim, Mr. Dezara (her boyfriend), had spent the night at her apartment- on the evening before he was murdered. The next day, after Mr. Bryer and Mr. Stewart had left the apartment so that Mr. Bryer could apply for a job at. a *1139 Wendy’s restaurant, she too left to go to her mother’s house to do. some laundry. Mr. Dezara remained at the apartment.
After being at her mother’s house for a couple of hours, Ms. Brown received a phone call from Mr. Bryer, at which time he reported that her apartment had been burglarized. She returned to her apartment and encountered the police. While she had been unable to enter her apartment at the time, she was aware that Mr. Dezara had been shot. Ms. Brown admitted on cross-examination that, when Mr. Bryer called her, he told her that two men had broken into her apartment, took some money from her dresser and that Mr. De-zara had been shot. She also admitted that she did not advise the officers of this information initially when she was questioned at the station.
According to Ms. Brown, on the night of the murder, Mr. Bryer commented that he “was going to the grave with it,” although she did not know what this meant.
IsMs. Brown testified that she and Mr. Stewart were later, looking at some photographs on Instagram[10] when Mr. Stewart became upset and angry, having recognized some of the individuals in the photographs. She clarified later on ' cross-examination that Mr. Stewart was upset because he did not want to testify. However, Ms. Brown urged Mr. Stewart to tell the truth if he knew something. Ms. Brown also testified that she had numerous conversations with Mr. Bryer; in one of those conversations, Mr, Bryer told her that, on the day of the murder, he had invited two people over, but she did not know to whom he was referring.
Lance Stewart confirmed Ms. Brown’s testimony that Mr. Dezara had spent the night before his death at his and Ms. Brown’s apartment. On the day of Mr. Dezara’s murder, he was at the apartment with Mr. Dezara and Mr. Bryer. Mr. Stewart confirmed Ms. Brown’s testimony that he and Mr. Bryer left the apartment so that Mr; Bryer could obtain a job application, at which point he saw Ms. Brown leave the apartment. Mr. Bryer then decided to return to the apartment. He borrowed Mr. Stewart’s phone to make a call. Two men then arrived at . the apartment and Mr. Bryer allowed them inside. One went to the bathroom and when he- returned, Mr. Stewart .saw him retrieve a gun from his pocket and cock it. Mr. Stewart heard Mr.- Bryer tell the two men “to just go forward and do what they came to do.”
Mr. Stewart testified that the two men went in Ms. Brown’s bedroom, where Mr. Dezara was located ánd brought Mr. De-zara out of the bedroom. They took him outside the apartment and within minutes, Mr. Stewart heard multiple |10gunshots. Being afraid, Mr. Stewart went into the bathroom and when he exited, he saw Mr. Bryer Walking in the front door. Mr. Bryer told Mr. Stewart that the men had’tried to rob the apartment. Mr. Stewart, in turn, called Ms. Brown and told her that the men had tried to rob the apartment.
When the police officers arrived at the apartment shortly thereafter, Mr. Stewart reported that the two men had tried to rob the apartment. He testified that he related that story because, at the time, that is what he believed had happened, and what Mr. Bryer had claimed. Mr. Stewart provided the officers with a description of the two men who he did not personally know.
Some time later, Mr. Stewart and Ms. Brown were looking at photographs on *1140 Facebook and Instagram and Mr. Stewart found a photograph with both of the men who had come to the apartment on March 9, 2018. He advised Ms. Brown that these were the two perpetrators and they contacted the police. Mr. Stewart was shown lineups at the police station and he identified Mr. Hawkins and Mr. Lewis as the two men who took Mr. Dezara out of the apartment and shot him. Mr. Stewart again positively identified Mr. Hawkins and Mr. Lewis at trial.
Mr. Stewart admitted at trial, on cross examination, that the second statement he gave to the police varied from the first statement given on the date of the murder, in which he merely reported the aggravated burglary and indicated that Mr. Bryer had walked in with his hands up and the two perpetrators behind him. He testified that the second statement was the correct statement. He likewise testified that he was scared for his life and had not wanted to get involved, and he agreed that “these [are] the two faces [of Mr. Hawkins and Mr. Lewis] that [he is] going to remember for the rest of [his] life.” He will remember these faces as | uthose who “[brought] Bernard Dezara out and [shot] him in the middle of the courtyard at 3:00 p.m. on a Saturday.”
Frank Johnson, the owner of a barbershop, who has known Mr. Lewis since he was a child, testified that, on the day of Mr. Dezara’s murder, Mr. Lewis was at his shop. Although he could not recall the precise time, he believed that Mr. Lewis arrived around 2:00 and left around 4:00. Mr. Lewis had brought his son with him to get a haircut and the two were going to a motor cross event that evening. Mr. Johnson admitted that he did not contact the police because he was unaware that Mr. Lewis had been charged in connection with Mr. Dezara’s murder. However, Mr. Lewis’ father approached him and asked if Mr. Lewis had been at the shop that day. Mr. Johnson had no record of Mr. Lewis’ having been at his shop because he always paid cash when he usually came to the shop every two weeks.

March 11,2013 incident

Detective Kyle Hinrichs, who was assigned to the Sixth District of the NOPD, testified that on March 11, 2013, he responded to a report of a shooting at the intersection of South Claiborne and Washington Avenues. When he arrived, there were other officers on the scene, tending to people at the scene who had been injured. Those individuals had been in a vehicle which crashed on South Claiborne Avenue.
Detective Hinrichs was then approached by David Drago, who informed him that he had seen someone running from the vehicle that had crashed, firing a gun and then throwing the gun on the median. Detective Hinrichs located the gun approximately twenty-five yards from where the vehicle had come to a rest. Mr. Drago identified Mr. Hawkins at the scene as the person he saw fire the gun and throw it on the median.
11gDetective Jonathan Bulliung, also working with the Sixth District in March, 2013, was the lead investigator of the shooting. He testified at trial that there were four people in the vehicle which crashed. One of those persons was Mr. Hawkins and another was Eric Harris. Two of the occupants of the vehicle sustained gunshot wounds in the incident. Detective Bulliung spoke with Mr. Drago, who related the same account of the incident that he gave to Detective Hinrichs. He applied for an arrest warrant and ultimately arrested Mr. Hawkins.
Mr. Drago, too, testified at trial. He was traveling in the area of South Claiborne and Washington Avenues on his way home on March 11, 2013 when he heard a lot of gunfire. He ducked, and turned his vehicle *1141 into the parking lot of a gas station and looked back. He then saw a vehicle crash into a pole. Someone at the gas station told him' that one of the men had discarded the gun on the median, and asked that he advise the officers about the weapon so that it did not fall into the hands of a child.
Meredith Acosta, a senior firearms and tool mark examiner for- the NOPD Crime Lab, who was accepted as an expert in the field of firearms and ballistics identification and testing, testified that she examined and tested the weapon found at the scene, as well as the ballistics evidence. According to Ms. Acosta, she compared the ballistics evidence from the March 11, 2013 .shootout with the evidence from the March 9, 2013 murder of Mr. Dezara and determined that the weapon used in both incidents was the same; that is, that the casings recovered from South Claiborne and Washington Avenues were fired from the same gun that was used in Mr. De-zara’s murder.
TERRORS PATENT
As part of our review of the record, we have detected two patent errors. First, that the record contains only the front of the indictment and does not contain the back of the document. Under La. C.Cr.P. art. 382 A, “[a] prosecution for an offense punishable by death, or for an offense punishable by life imprisonment, shall be instituted by indictment by a grand jury.”[11] Under La. C.Cr.P. art. 383, an indictment must be “indorsed ‘a true bill,’ and the indorsement must be signed by the foreman.” In this matter, while the indictment contained in the record does not have the reverse side, which ordinarily displays the proper endorsement and signature, the docket master and the list of the grand jury return of indictments in the record both reflect that the indictment was returned as a “true bill” in open- court and was signed by the grand jury foreperson.
This Court recently indicated that the failure of the record to contain the reverse side of an indictment, where the record reflects (by way of the court minutes) that a true bill was returned and the grand jury return of indictments reflects that the indictment was signed by the grand jury foreperson is harmless error. State v. Chambers, 16-0712, p. 4 (La.App. 4 Cir. 2/15/17), 212 So.3d 643, 647-48. We have also held that the failure of a defendant to object to alleged deficiencies in an indictment and the failure of a defendant to file a motion to quash the indictment on that basis waives those errors. State v. Porche, 00-1391, p. 5 (La.App. 4 Cir. 2/14/01), 780 So.2d 1152, 1155; See also, State v. Miller, 98-642 (La.App. 3 Cir. 10/28/98), 720 So.2d 829, 831. Accordingly, we find no reversible error in this error patent.
Second, we note an error in Mr. Hawkins’ sentence. On the charge of obstruction of justice, the trial court indicated that the sentence was to be served without benefit of probation, parole or suspension of sentence. La. R.S. 14:130.1, the obstruction of justice statute, does not restrict probation, parole or suspension of sentence. That being the case, the multiple offender statute, La. R.S. 15:529.1 G provides that “[a]ny sentence imposed under the provisions of this Section shall be at hard labor without benefit of probation or suspension of sentence.” La. R.S. 15:529.1 G makes no mention of parole. Thus, while the trial court correctly imposed the sentence without benefit of probation or suspension of sentence, it erred when it pro *1142 hibited parole. We therefore delete the prohibition of parole eligibility in Mr. Hawkins’ sentence.
We now turn to the defendants’ assignments of error.
DISCUSSION

Mr. Lewis’ assignment of error number one

As his first assignment of error, Mr. Lewis contends that the evidence at trial was not sufficient to uphold a conviction of second degree murder.[12] Second degree murder is defined, in pertinent part, by La. R.S. 14:30.1 as follows:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
1 ir(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated or first degree rape, forcible or second degree rape, aggravated-arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.
Mr. Lewis argues that, based on the alibi evidence of Mr. Johnson at trial and the fact that his identification was made by a “witness who was brain damaged” and “lied to the detectives in this case in at least two different statements... before. .. ultimately implicating [Mr. Lewis]-,” the State did not establish Mr. Lewis’ identity as a perpetrator of Mr. Dezara’s murder.
The Louisiana Supreme Court, in Mar,-cantel, explained the standard of review in considering a sufficiency of the evidence claim:
The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the State proved the essential elements of the crime beyond a reasonable doubt. See LSA-C.Cr.P. art. 821; State v. Hampton, 98-0381, p. 13 (La. 4/23/99), 750 So.2d 867, 880, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999). Pursuant to Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the standard of review is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. Louisiana Revised Statute 15:438 provides that the fact finder, when -analyzing circumstantial evidence, ihust be satisfied the overall evidence excludes every reasonable hypothesis of innocence. State v. Mitchell, 99-3342, p. 7 (La. 10/17/00), 772 So.2d 78, 83.
Id., 00-1629, p. 8, 815 So.2d at 55-56; See also, State v. Armstead, 11-1344, p. 4 (La. App. 4 Cir. 7/25/12), 98 So.3d 891, 894. “Ultimately, all evidence, both direct | lfiand circumstantial must be sufficient under Jackson to prove guilt beyond a reasonable doubt to a rational, jury.” Armstead, p. 4, 11-1344, 98 So.3d at 894, quoting State v. Brown, 03-0897, p. 22 (La. 4/12/05), 907 So.2d 1, 18.
*1143 When “circumstantial evidence forms the basis of a conviction, such evidence must consist of ‘proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience.’” State v. Castro, 16-0284, p. 7 (La. App. 4 Cir. 12/14/16), 206 So.3d 1059, 1064, quoting State v. Shapiro, 431 So.2d 372, 378 (La. 1982). “The essential elements must be proven in such a way that every reasonable hypothesis of innocence is excluded.” Id., 16-0284, pp. 7-8, 206 So.3d at 1064. This principle is codified in La. R.S. 15:438, which provides that “[t]h’e rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” In that regard, all evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jackson, 15-0809, p. 10 (La.App. 4 Cir. 5/25/16), 193 So.3d 425, 433, citing State v. Jacobs, 504 So.2d 817 (La.1987).
In Castro, we set forth the well-established standard of review for appellate courts in evaluating-a fact-finder’s conclusions:
[A]s ⅛ reviewing court, we are highly deferential to the findings of the trier of fact. See State v. Hamdan, 13-0113, p. 10 (La.App. 4 Cir. 12/11/13), 131 So.3d 197, 204. The jury may thus accept as true the testimony, of any witness, even a single witness, and find such testimony sufficient to establish each element of an offense beyond a reasonable doubt. See id. Our review will'only impinge upon this fact-finding function to the extent necessary to assure, compliance with Jackson v. Virginia. See State v. Macon, 06-481, p. 8 (La. 6/1/07), 957 So.2d 1280, 1285. Thus, we will only tread on a jury’s presumed acceptance of a witness’s testimony when that testimony is implausible or clearly contrary to [17the evidence. See [State v.] Mussall, 523 So.2d [1305,] 1311 [ (La. 1988) ]; see also [State v.] Clements, [15-0630,] p. 8 [(La.App. 4 Cir. 5/4/16)], 194 So.3d [712,] 717.
Castro, 16-0284, p. 8, 206 So.3d at 1064. An appellate court will not reweigh the credibility of the witnesses or reweigh the evidence when reviewing the sufficiency of the evidence. See State v. Everette, 15-0805, p. 12 (La.App. 4 Cir. 4/20/16), 192 So.3d 249, 256. “Rather, the appellate court reviews fhe evidence to determine whether it meets minimal constitutional sufficiency standards” under Jackson v. Virginia. Id.
The thrust' of Mr, Lewis’ argument is that the State failed to prove his identity as a perpetrator of Mr. Dezara’s'murder, particularly given that there was a lack of physical evidence connecting him to the murdér. As this Court noted in State v. Stewart, 04-2219, p. 6 (La.App. 4 Cir. 6/29/05), 909 So.2d 636, 639, when a defendant disputes identity, “the State must negate any reasonable probability of mis-identification in order to satisfy its burden under Jackson v. Virginia.” (Citations omitted). “Normally, when disputing identity, a defendant seeks to cast doubt on a physical identification, requiring a reviewing court to employ the five-part test for determining the reliability of an identification set forth in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).” State v. Falgout, 15-0953, p. 17 (La.App. 4 Cir. 8/24/16), 198 So.3d 1232, 1241-42.
The factors set forth in Manson and consistently applied to misidentification claims are:
(1) the opportunity of the witness to view the assailant at the time of the crime; • (2) the witness’ degree of attention; (3) the accuracy of the witness’ prior description of the assailant; (4) the level of certainty demonstrated by the *1144 |1Rwitness; and (5) the length of time between the crime and the confrontation.
State v. Sandifer, 15-0590, p. 12 (La.App. 4 Cir. 4/20/16), 195 So.3d 119, 126, quoting State v. Stewart, 04-2219, p. 6 (La.App. 4 Cir. 6/29/05), 909 So.2d 636, 639.
Importantly, our jurisprudence clearly reflects that a positive identification by a single witness is sufficient to support a conviction. Id.; State v. Spencer, 14-0003, p. 12 (La.App. 4 Cir. 10/8/14), 151 So.3d 816, 824; State v. Sippio, 13-0206, p. 2 (La.App. 4 Cir. 1/30/14), 133 So.3d 294, 296; State v. Lambert, 15-0886, p. 7 (La. App. 4 Cir. 1/20/16), 186 So.3d 728, 734, writ denied, 16-0335 (La. 2/17/17), 216 So.3d 50, 2017 WL 744137. Indeed, an appellate court “will not second-guess the credibility determinations of the fact finder beyond the constitutional standard of sufficiency.” Sippio, 13-0206, p. 3, 133 So.3d at 296.
In this matter, Mr. Stewart positively identified Mr. Lewis as one of the men who had entered the apartment and, along with Mr. Hawkins, brought Mr. Dezara out of the apartment, shortly after which, Mr, Stewart heard numerous gunshots. Mr. Stewart first identified Mr. Lewis from photographs he saw on social media outlets. After realizing that it was a “messed up situation that happened,” and at the encouraging of his sister to “tell the truth about what happened,” Mr. Stewart and Ms. Brown contacted Detective McCourt and advised that they wanted to speak to her again. Mr. Stewart was shown a photographic lineup, in a double blind procedure, and he positively identified Mr. Lewis as one of the perpetrators, a man whose face he would “remember for the rest of [his] life.” He also positively identified Mr. Lewis again at trial.
11 aWhile Mr. Lewis maintains that his alibi witness, Mr. Johnson, contradicted Mr. Stewart’s testimony which placed him at the scene of the crime, it is clear that the jury chose to discount Mr. Johnson’s testimony and believed that of Mr. Stewart. While the jury was well aware of the discrepancy, the jury obviously chose to believe the testimony of Mr. Stewart over that of Mr. Lewis’ alibi witness. Such a determination of credibility is within the purview of the jury; it is not the function of the appellate court to evaluate the credibility of witnesses and overturn the trial court on its factual determination of guilt. State v. Brown, 08-1434, p. 5 (La.App. 4 Cir. 3/18/09), 7 So.3d 1238, 1240.
We are not persuaded by Mr. Lewis’ argument that Mr. Stewart’s admitted brain damage from a head injury in a 1997 motor vehicle accident renders his testimony not credible. There was no evidence, either by expert witness testimony or otherwise, that Mr. Stewart’s medical impairment in any way affected his ability to understand what he witnessed on March 9, 2013, or affected his ability to make a proper identification.
Based on the foregoing, and in viewing the evidence in the light most favorable to the State, we find that the jury was not unreasonable in concluding that Mr. Lewis was guilty of second degree murder.[13]

Mr. Hawkins’ assignment of error number one

As his first assignment of error, Mr. Hawkins maintains that the trial court *1145 erred in allowing evidence of the prior conviction for accessory after the fact of the 12(lmurder of Mr. Domingue. As noted, the trial court conducted a hearing on the issue and ruled that the prior conviction was admissible. See, footnote 2, supra. Mr. Hawkins also maintains that the trial court erroneously allowed evidence of the charge of illegal discharge of a firearm during a violent crime, and obstruction of justice stemming from the March 11, 2013 incident.
The admissibility of “other crimes” evidence is governed by La. C.E. art. 404, which provides, in pertinent part, as follows:
A. Character evidence generally. Evidence of a person’s character or a trait of his character, such as a moral quality, is not admissible in a civil or criminal proceeding for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
(1) Character of accused. Evidence of a pertinent trait of his character, such as a moral quality, offered by an accused, or by the prosecution to rebut the character evidence; provided that such evidence shall be restricted to showing those moral qualities pertinent to the crime with which he is charged, and that character evidence cannot destroy conclusive evidence of guilt.
⅜ ⅝ ⅛ ⅜ ⅝
B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
Prior to the recent Supreme Court decision of State v. Taylor, 16-1124, 16-1183 (La. 12/1/16), 217 So.3d 283, 2016 WL 7030750, our jurisprudence indicated l^that, as a general rule, under Prieur, “evidence of other crimes committed by the defendant is inadmissible due to the ‘substantial risk of grave prejudice to the defendant.”’ State v. Keys, 12-1177, p.14 (La.App. 4 Cir. 9/4/13), 125 So.3d 19, 31. As we noted in Keys, and under La. C.E. 404(B)(1), “evidence of other crimes, wrongs or acts are generally not admissible to prove character.” Id. The exceptions to those -general rules, however, include the admission of other crimes evidence “for the purposes, of proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident or when the evidence relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.” Id. Additionally, in Keys, we observed that other crimes evidence would not be “admissible unless it tends to prove a material fact at issue or to rebut a defendant’s defense, and the probative value of the evidence must outweigh its prejudicial effect.” Id.
Prieur “held [that] if the state is able to show by clear and convincing evidence that the defendant committed the other crime, such evidence may well be properly admissible.” Taylor, 16-1124, 217 So.3d at 288, 2016 WL 7030750 at *4-5. The Taylor Court, after reviewing legislative changes in “other crimes” evidence, overruled the Prieur decision’s requirement that the State must prove that the defendant com *1146 mitted the other offense or bad act by clear and convincing evidence. The Court held that the State need only make a showing of sufficient evidence that the defendant committed the other crime or bad act:
We find no constitutional requirement for adherence to the “clear and convincing” evidence standard set forth in Pri-eur. Given the clear language of Code of Evidence Articles 1104 and 104(B), and considering the Supreme Court’s holding in Huddleston [v. United States, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988) ], we now recognize and hold that when seeking to introduce e|videnceaa pursuant to La. C.E. art. 404(B), the state need only make a showing of sufficient evidence to support a finding that the defendant committed the other crime, wrong, or act.
Id., 16-1124, 217 So.3d 283, at 291, 2016 WL 7030750 at *6.
We note, too, that “a trial judge’s ‘ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion.’” State v. Ross, 15-1113, p. 6 (La.App. 4 Cir. 12/21/16), 207 So.3d 511, 516. (Citation omitted). After our review of the record, we find no abuse of the trial court’s discretion in the admission of other crimes evidence in this case.
At the hearing on the Prieur motion, the State argued that evidence of the April 19, 2012 incident (for which Mr. Hawkins was charged and entered an Alford plea) and evidence of the discharge of a firearm and obstruction of justice charges arising out of the March 11, 2013 incident were admissible to show identity and the absence of mistake. We agree.'
The evidence at trial indicated that the officers learned of Hawkins’ nickname, G-4, during the investigation of Hawkins’ relationship with Eric Harris (who was in the vehicle involved in the March 11, 2013 shooting and whose blood, according to DNA testing as testified by Detective Bul-liung at trial, was found on the gun involved in that incident) and a gang known as the “Bird Gang.”[14] Detective Rice, who provided Detective McCourt with Mr, Hawkins’ identity as G-4 as a suspect, was the lead investigator of the April 19, 2012 incident. Thus, [ mthe admission of the April 19, 2012 incident was crucial in identifying Mr. Hawkins in connection with Mr. Dezara’s murder.
Similarly, according to Detective Rice, Eric Harris-was the person to whom Quilla Harris had loaned the rental car which was identified by eye-witnesses as having been involved in the April 19, 2012 incident. As Detective Rice indicated, Mr. Harris and Mr. Hawkins were known associates of each other and Mr. Harris was likewise involved in the April 19, 2012 incident. Mr. Harris’ relationship with Mr, Hawkins and his, involvement, along with Mr. Hawkins in the March 11, 2013 shooting, were relevant.to the charge of illegal discharge of a weapon.
Moreover, the March 11, 2013 shooting occurred in the same vicinity as the April 19,2012 incident and involved the very gun that was used in Mr. Dezara’s murder.
The trial court, at the Prieur hearing, stated that “if this, evidence were to be *1147 admitted at trial,- it would prove to be more probative than prejudicial and it does go towards proving opportunity, intent, knowledge, identity and absence of mistake or accident... [and as] a result, [it would] be placed, into evidence.” We find no abuse of the trial court’s discretion in allowing the evidence. See, State v. Garcia, 09-1578 (La. 11/16/12), 108 So.3d 1.

Lewis’ and Hawkins’ assignments of error number 2

The defendants both contend that the trial court erred in allowing evidence of their association with á gang into evidence. They argue that the evidence was highly prejudicial and thus, should have been excluded. As previously noted, the State filed a motion prior to trial seeking to introduce evidence of their gang affiliation at trial, which was granted by the trial court. This Court then denied Mr. Lewis’ application for a supervisory writ of review on this issue. See, footnote 3.
| a/This Court recently reiterated the “law of the case doctrine” which indicates that “appellate courts generally decline to reconsider their own rulings of law on a subsequent appeal in the same case.” State v. Lewis, 16-0224, p. 10 (La.App. 4 Cir. 12/29/16), 209 So.3d 202, 209. This doctrine “applies to all prior rulings or decisions of an appellate court or the Supreme Court in the same case, not only those arising from an appeal.” Id. Under this doctrine, “an appellate court will not reverse its pretrial decision unless the defendant presents new evidence tending to show that the pretrial decision was patently erroneous and produced an unjust result. ..[;] judicial efficiency demands that great deference be accorded to the earlier decision.” Id., 16-0224,p. 10, 209 So.3d at 209-10. The Lewis Court refused to reconsider on appeal the trial court’s ruling on a motion to quash, after the denial of his writ application on the basis that he “failed to present any new evidence bearing on the correctness of this court’s prior decision.” Id., p. 10, 209 So.3d at 210.
In this matter, only Mr. Lewis sought supervisory review of the trial court’s decision to allow the introduction of evidence of his - gang affiliation at trial. Because Mr. Hawkins did not seek review of the trial court’s pre-trial ruling, we now consider the admission of this evidence at trial. We note, at the outset, that a trial court’s ruling on the admissibility of evidence at trial “will not be' overturned absent an abuse of discretion.” State v. Spratt, 13-0158, p. 19 (La.App. 4 Cir. 11/20/13), 129 So.3d 741, 751, writ denied, 13-2960 (La. 5/30/14), 140 So.3d 1173.
Mr. Lewis first argues that “the trial court ruled that the evidence was admissible, but only through a. first person party, and that a police officer would not be allowed to testify without .evidence, nor would a police officer be allowed to 125testify that they had obtained the. information by hearing it. on the street.” He then argues.that the trial court erred in allowing Detective Krzemieniecki to testify that both Mr. Lewis and Mr. Hawkins were members of the Bird Gang.
At the May 16, 2014 hearing on the admissibility of gang affiliation, the trial court did state that “the evidence, that the State seeks to introduce is admissible. And it is relevant to the prosecution” of the defendants. The trial court then Stated that “[a]ny evidence that will be introduced must be from first person parties. It cannot be referred to by a police officer, without evidence as such.”
The first introduction of the defendants’ association with the Bird Gang came on the first day of trial, September 21, 2015 with the testimony of Detective McCourt, who was asked: “through your investigation, were you able to obtain information whether Mr. Hawkins and Mr. Lewis were associated with any street gang.” After *1148 answering in the affirmative to the question, she was then asked to identify the gang, as evidenced by the following colloquy:
Q. And what street gang?
A. Bird Gang.
Q. And through your investigation, you were able to obtain that they were not only associates of Bird Gang, but they were heavily involved in Bird Gang?
A. Correct.
At that point, counsel for Mr. Hawkins objected to the question as leading. After the State indicated that it had no further questions, counsel for Mr. Lewis stated, “Mbjection to Bird Gang.” While the basis of the objection by Mr. Lewis’ counsel is unclear, no objection was raised when Detective McCourt first testified that the defendants were members of the Bird Gang. Counsel for Mr. Hawkins l^then argued that the State had gone “way outside the scope of redirect” and the trial court indicated that it would allow the State to “ask limited questions in regard to both of [the defendants].” Thereafter, Detective McCourt indicated that she had been advised “that they were part of the Bird Gang.” No objection was raised at that time.
As this Court recently reiterated, “a defendant cannot avail himself of an alleged error without having made a contemporaneous objection stating the specific ground of the objection.” State v. Halley, 16-0713, p. 3 (La.App. 4 Cir. 2/8/17), 212 So.3d 596, 599. Once the issue of the defendants’ gang association was introduced, the proverbial “door” was opened as to that evidence.
Detective Krzemienicki, who is assigned to a multi-agency gang unit (See footnote 14, supra), testified at trial as follows:
Q. And I would like to address or turn your attention to individuals known as Glynn Hawkins and Alex Lewis. Were you able to identify Glynn Hawkins and Alex Lewis as members of the Bird gang?
A. Yes, I was.[15]
No objections were raised in connection with Detective Krzemienicki’s testimony, including her identification of the defendants as members of the Bird gang. Again, the defendants cannot now allege that the admission of her testimony was in error.
Moreover, even if the trial court erred in allowing testimony regarding the defendants’ gang affiliation into evidence at trial, we find that this evidence is subject to a harmless error analysis, discussed infra. See State v. Barnes, 28,835, 27p. 14 (La.App. 2 Cir. 12/11/96), 685 So.2d 1148, 1155. It is clear that, under La. C.E. art. 404 B(1), “evidence of other crimes is not admissible to show that a defendant has acted in conformity with his bad character” and thus, “[s]uch evidence is only admissible if the State shows an independent and relevant basis for it, namely those grounds set forth in La. C.E. art. 404B(1).” State v. Waterhouse, 14-1048, p. 3 (La.App. 4 Cir. 6/19/15), 171 So.3d 1113, 1115. The courts have recognized that “the underlying policy is not to prevent prejudice, since evidence of other crimes is always prejudicial, but to protect against unfair prejudice when the evidence is only marginally relevant to the determination of guilt of the charged crime.” State v. Williams, 02-645, p. 16 (La.App. 5 Cir. *1149 11/26/02), 833 So.2d 497, 607. In fact, the Bames court, in addressing the admissibility of gang affiliation into evidence, noted that this type of evidence can be highly prejudicial:
In today’s society, members of gangs are not regarded as model citizens. There is an inherent connotation that a gang member is involved in criminal activity. The fact that the defendant was a gang member could have, and probably did, create an image of a bad person in the eyes of the jury.
Id., 28,835,p. 14, 685 So.2d at 1165. The Bames court then noted that, in that particular case, where the State sought to introduce evidence of the defendant’s gang affiliation at his armed robbery trial, that “[wjhile a defendant’s gang membership may be probative under certain conditions, whether this defendant was a member of a gang was not relevant to any of the essential elements of this armed robbery.” Id.
In Waterhouse, this Court noted that evidence of gang affiliation can be admissible when it bore directly on the facts of this case “to show the motive for [⅛ defendant’s actions that caused injury or death to the victims, who were members of a rival gang.” Waterhouse, 14-1048, p. 6, 171 So.3d at 1116, citing State v. Sumlin, 44,805, 44,806 (La.App. 2 Cir. 10/28/09), 25 So.3d 931; State v. Brown, 42,054 (La.App. 2 Cir. 8/29/07), 965 So.2d 580; Williams, supra. In Brown, for example, the court held that evidence of the defendant’s gang affiliation “was relevant to show his motive to specifically injure the intended victim, who was affiliated with a rival gang... [and] the trial court’s finding that the evidence relates to conduct that constitutes an integral part of the alleged double murder.” Id., 42,054, pp. 12-13, 965 So.2d at 588.
Similarly, in Sumlin, the trial court’s allowance of gang affiliation evidence was affirmed on appeal given that the evidence “clearly prove[d] that defendant and the deceased were members of rival gangs, that there was mounting tension between the two groups, and that, in the gang world, this type of retaliation is wholly within the bounds of their everyday life.” Id., 14,805, p. 14, 25 So.3d at 939.
In this matter, the State contends that the evidence of Mr. Hawkins’ and Mr. Lewis’ gang affiliation was relevant “to prove [their] motive to kill” Mr. Dezara. The State argues that the defendants’ and Mr. Bryer’s affiliation with the Bird gang, coupled with the fact that' Mr. Bryer and Mr. Dezara had had a discussion about the gang and Mr. Bryer’s phone call shortly before the defendants arrived and Mr. De-zara was killed, would lead a “reasonable juror” to the conclusion that Mr. Bryer “informed members of the [Bird] gang that [Mr. Dezara] had said something offensive about the gang and that [Mr. Byer] set [Mr. Dezara] up for [the defendants] to exact revenge.” The State further argues that the gang | ^association evidence explained “why Mr. [Eric] Harris’s DNA would be on the gun used ... to murder [Mr. Dezara].”
While we agree with the State that the gang affiliation certainly establishes the defendants’ relationship with one another and with Mr. Bryer and Mr. Harris,[16] there is an absence of a link between their affiliation to a gang and Mr. Dezara’s murder. That is, there is no evidence that the victim, Mr. Dezara, was in a rival gang or involved in an ongoing dispute. Nor was there any evidence that Mr. Dezara’s murder was in retaliation for any particular event. While Mr. Stewart testified that Mr. Bryer allowed Mr. Hawkins and Mr. Lewis *1150 into the apartment and indicated that they should “do what they came to do,” this only tends to support the element of intent for second degree murder under La. R.S. 14:30.1.
Thus, while evidence of the defendants’ gang affiliation may not have shed light on their motive for killing Mr. Dezara and, thus, should not have been admitted at trial, we find, as did the Barms court, that although the evidence may have been “prejudicial and irrelevant to the essential elements of the offense,. ... the guilty verdict rendered in this trial was not attributable to the error and was thus harmless error.” Id., 28,835, p. 14, 685 So.2d at 1155. As noted herein, the testimony of one witness, alone, may suffice for a guilty verdict. Here, Mr. Stewart unequivocally and, with certainty, identified the defendants as having entered the apartment, removed Mr. Dezara from it with Mr. Bryer and testified that shortly thereafter, he heard multiple gunshots. This positive identification led the jury to conclude that the defendants killed Mr. Dezara. We find therefore that |anthe testimony that the defendants were gang members did not contribute to the guilty verdicts. See also, Sumlin, 44,806, p. 14, 25 So.3d at 940 (evidence of the fact of gang affiliation was relevant to show defendant’s motive in killing [the victim] and trying to kill [another victim]. The State showed that the evidence was more probative than prejudicial.... At the absolute worst, this evidence was harmless error.).
We find no merit to this assignment of error.
CONCLUSION
For the foregoing reasons, we affirm the defendants’ convictions. We likewise affirm Mr. Lewis’ sentence. Mr. Hawkins’ sentence is affirmed as to the convictions for second degree murder and illegal discharge of a weapon. Mr. Hawkins’ sentence on the obstruction of justice conviction is amended to delete the prohibition of parole, and as amended, affirmed.
AMENDED AND AFFIRMED

. The indictment also named Jerrel Bryer for the second degree murder of Mr. Dezara; however, it was later amended to manslaughter as concerns Mr. Bryer, who pled guilty to the amended charges, waived delays and was sentenced to twenty-three years at hard labor, without benefit of probation, parole or suspension of sentence.

. Based upon State v. Prieur, 277 So.2d 126 (La. 1973), abrogated by State v. Taylor, 16-1124, 16-1125 (La. 12/1/16), 217 So.3d 283, 2016 WL 7030750, the State sought to introduce evidence of Mr, Hawkins’ arrest and conviction for accessory .after the fact with respect to the April 19, 2012 murder of Jeffrey Dominique, who had been shot and killed in a vehicle at the intersection of Carondelet *1136 Street and Jackson Avenue in New Orleans, Louisiana. Mr, Hawkins pled guilty to this charge pursuant to North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), which is "a ‘best interest' plea...in which the defendant pleads guilty while maintaining his innocence.” Lewis v. Dep’t of Police, 11-1408, p. 5 n.2 (La.App. 4 Cir. 5/4/12), 89 So.3d 452, 459 (Tobias, J., concurring).

. State v. Lewis, unpub., 14-0628 (La. App. 4 Cir. 8/18/14). Mr. Bryer, too filed a writ application on the trial court's ruling on the admissibility of gang association evidence, which was denied by this Court as well. State v. Bryer, 14-0621, unpub. (La. App. 4 Cir. 8/18/14).

. According to Detective Rice, he was unable to determine who was the actual shooter in the Domingue murder.

. At that time, the officers were unable to identify Mr. Dezara as he had no identification. Mr. Dezara’s identification was made after the investigating officers obtained a first name and a social media screen name. Because ffie settings of the social network were not private, Mr. Dezara’s identification was ultimately made.

. The apartment was the residence of Coreille Brown, Mr. Dezara’s girlfriend.

. According to Ms. Brown, her mother adopted Mr. Stewart. Jerrel Bryer is Ms. Brown’s cousin.

. Detective McCourt also learned that Mr. Hawkins had been arrested in connection with a shootout on March 11, 2013, discussed infra. A nine-millimeter handgun seized in connection with this shootout was determined to have been one of the murder weapons in the Dezara murder.

.The lineup was conducted as a "double blind” lineup, whereby a detective who is not involved in the investigation and does not know the identity of the suspect conducts the lineup so that, according to Detective McCourt, "it’s a clean procedure.”

. On cross-examination, Ms. Brown was .questioned about her having told an assistant district attorney that she had been perusing Instagram to look for pictures of possible perpetrators. While she could not recall thijs ■statement, she admitted that the statement was made closer in time to the murder than trial. . - .

. Second degree murder, with which the defendants were charged, is an offense requiring an indictment. La. R.S. 14:30.1 B provides that "[w]hoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.”

. We address this assignment of error before any - others, including those raised by Mr. Hawkins; “[w]hen issues are raised on appeal as to the sufficiency of the evidence and as to one or more [other] trial errors, [the reviewing court is to] first determine the sufficiency of the evidence.” State v. Marcantel, 00-1629, p. 8 (La. 4/3/02), 815 So.2d 50, 55, citing State v. Hearold, 603 So.2d 731, 734 (La.1992).

. We note that there was a lack of eyewitness testimony or evidence as to which of the defendants actually shot Mr. Dezara. However, our jurisprudence indicates that "[a] person may be convicted of an offense even if he has not personally fired the fatal shot. The law of principals states that all persons involved in the commission of a crime, whether present or absent, are equally culpable.” State v. Hampton, 98-0331 (La. 4/23/99), 750 So.2d 867, 880.

. Detective Kristen Krzemiéniecki, of the NOPD, who is assigned to a multi-agency task force on, gang activity, testified at trial that Mr. Hawkins and Mr. Lewis were known to be members of the Bird Gang and that Mr. Bryer was known to be an associated with it as well. According to Detective Krzemien-iecki, Eric Harris was also a member of the Bird Gang. The parties refer to the gang as the "Byrd” gang, while the trial transcript refers to it as the "Bird” gang. We will refer to it as the "Bird” gang so as to be consistent with the trial transcript.

. Detective Krzemieniecki also identified Eric Harris as a member of the Bird gang as well.

. There was also clear evidence that Mr. Hawkins and Mr. Harris were both involved in the March 11, 2013 shootout on S. Claiborne and Washington Avenues.